[Civ. No. 19594.    Second Dist., Div. Three.    Apr. 26, 1954.]

GEORGE SPENCER WICE et al., Appellants, v. JOSEPH
SCHILLING et al., Respondents.

736

Henry C. Rohr for Appellants.

Harvey L. Silbert and Herbert Glaser for Respondents Greenberg and Schilling. Louis Ballenger and Edward B. Olsen for Respondent Van Kolken.

WOOD (Parker), J.—On March 16, 1949, the plaintiffs and the defendants Schilling and Greenberg agreed to exchange real property. The property to be received by plaintiffs consisted of three apartment buildings at 312-318 East Palmer Street in Glendale. One of the conditions of the exchange, as shown by the escrow instructions, was that said defendants would place in escrow for delivery to plaintiffs "A termite clearance issued by a licensed termite control company." Defendant Van Kolken, a termite exterminator, was doing business as Termite and Structural Pest Control. The first cause of action herein is against defendants Schilling and Greenberg and their alleged agent, defendant Van Kolken, for damages for fraud by reason of their false representations to the effect that said apartment buildings were free and clear of termites. The second cause of action is against defendants Schilling and Greenberg for damages for breach of their contract to convey the property free from visible evidence of termit and dry rot infestation. In a nonjury trial, judgment was for defendants. Plaintiffs appeal.

When the escrow was opened (March 16, 1949) Mr. Schilling asked Mr. Wice if he would accept a "termite clearance"

report which had been issued to the Schillings and the Greenbergs a few months previously. Mr. Wice replied that he would be willing to accept the clearance if it was issued within the past four or five months.

On September 4, 1948, Van Kolken issued a termite report on said Glendale property, upon the order of Mr. Cahoon who was then the owner of that property. That report consisted of 11 pages of typewriting and three charts—a total of 14 sheets of paper. As to each of the three buildings, there was a report regarding its condition, a chart indicating infested areas, a recommendation No. 1, and a recommendation No. 2. The recommendations were on separate sheets of paper. The report specified various parts of the buildings that were infested with subterranean and kaloterme termites, or infected with fungi. Statements in the report were to the effect that termites were infesting, in certain places, the subfloor and floor plates of the buildings, mudsills under two porches, a window casing, ceiling plates and joists, ribbon under roof rafters, rafters, and wood structure of rear porches of one building. Also there were statements therein to the effect that the wood structure in the lower part of a stucco arch was gone due to termites and fungi; that the dirt, in the dirt-filled front and rear cement porches, was against the stucco walls of the buildings, and there was evidence that those areas had been infested with termites; that stucco would have to be removed from a wall of one building, from ceiling to top of wall, to treat termites; and that stucco should be removed from the attic portion of a wall of another building to treat termites.

The recommendations known as No. 1 were as follows: the front and rear porches should be sealed off (where the dirt is against the walls) with a cement wall; remove as much stucco as necessary on walls above ceilings, and as much stucco as necessary at floor levels, and treat termites with arsenic insecticide; remove the infected stucco arch, and stucco the wall; treat all the specified infested areas of the buildings, and the infested ground areas under the buildings, with arsenic insecticide. Under that recommendation the total charge for the work would be $3,158.10. The recommendations known as No. 2 were as follows: treat all the specified infested areas of the buildings with arsenic insecticide; punch holes in stucco and drill holes in wood structure of one ceiling and one attic wall and treat with insecticide; drill holes in subfloor and floor plates and treat

with insecticide; pull dirt from mudsill and remove form boards and treat those areas and soil around porches with insecticide. Under that recommendation the total charge for the work would be $795.85. Mr. Cahoon directed Van Kolken to do the work specified in the recommendations No. 2, and the work was completed about November 12, 1948.

Mr. Cahoon sold said property to the Pacific Western Realty Company and an escrow in that transaction was opened at a bank at Sixth Street and Western Avenue, Los Angeles. On November 15, 1948, while that escrow was pending and in accordance with instructions from Cahoon, Van Kolken sent to Cahoon his said termite report, above described consisting of 14 sheets of paper, which included his recommendations Nos. 1 and 2. He sent to that escrow at said time a document, dated November 15, 1948, which stated in part as follows: "To the best of our knowledge the above property [involved here] is now free from termites and fungi, we assume no responsibility for damage or infestation that cannot be reasonably detected without opening concealed areas or timbers. Termite and Structural Pest Control By R. F. Van Kolken."

While that escrow pertaining to the sale by Cahoon to Pacific was pending, Pacific sold the property to the Schillings and Greenbergs, and another escrow, regarding the last-mentioned transaction, was opened at the same bank on September 22, 1948. The escrow instructions in said last transaction stated in part: "Seller [Pacific] will deposit into escrow report of Termite and Structural Pest Control Company dated Sep't. 4, 1948 covering property described herein . . . Said report has been read, examined by the buyer herein [Schillings and Greenbergs] and approved. No further approval necessary. You are authorized and instructed to pay to Termite and Structural Pest Control Company the sum of $794.95, when you are in receipt of a certificate or statement from the said Termite Company, that the work as outlined in various reports has been completed, from the monies which you hold in escrow #55-4673 [escrow in sale from Cahoon to Pacific]." Defendant Schilling testified that the "report" of September 4, 1948, referred to in his said escrow instructions as a report that he had read and approved, was a group of documents (eight sheets and three charts) known as "Exhibit 4" at the trial; and the documents comprising said Exhibit 4 were read by him when he approved them as the termite report. Said Exhibit 4 is a part of the report (of 14

sheets) which Van Kolken sent to Cahoon on November 15, 1948. The parts of said report of Van Kolken which are not in Exhibit 4 are the three sheets comprising the three recommendations No. 1, wherein he specified the repairs and treatment for which he would charge $3,158.10. In other words, the termiite report in the escrow in the sale by Pacific to the Schillings and Greenbergs was not the whole report which Van Kolken sent to Cahoon in the sale by Cahoon to Pacific,—the recommendations No. 1 (three sheets) were omitted.

At the bottom of the above-quoted document, dated November 15, 1948, which Van Kolken sent to the Cahoon-Pacific escrow and wherein he stated that to the best of his knowledge the property was free from termites, there appears the following endorsement: "Approved for payment JS. Approved for payt  P W Rlty Co  By T L G." The initials "JS." appearing thereon were written by defendant Joseph Schilling. Said sum of $795.85 (erroneously referred to as $794.95), which Van Kolken charged for the termite work under the second recommendation of his report, was paid to him on December 19, 1948 from the Cahoon-Pacific escrow.

The escrow in the sale from Pacific to the Schillings and Greenbergs was closed on January 17, 1949, and about two months thereafter the escrow in the present transaction was opened at the same bank which had been the escrow agent in the other two escrows. As above stated, Mr. Wice agreed to accept the "termite clearance" which had been issued to the Schillings and Greenbergs in their escrow with Pacific.

Van Kolken testified that about May 12, 1949, an employee in the escrow department of the bank (where the escrow was pending) called him by telephone and said that "they had copies of Mr. Cahoon's reports on file and that a Mr. Schilling would like to have an outline of the work that had been done there, with a copy of the clearance"; then Van Kolken said, "What do you mean, an outline of the work?" The employee replied, "The work that you did on the property." Van Kolken said, "If that is what you want I can get it. I don't know as I will have everything on the report . . . all the work that had been done. It would take quite a bit of time." The employee said, "I don't care just how you put it. Just so we get some kind of an outline." The employee asked him to "make it to Mr. Schilling"; the employee gave him Schilling's address and told him to send it (outline) to the bank; Van Kolken made the document "with Mr. Schilling's name

and address on it," and mailed it to the bank. The document was as follows:

"May 14, 1949

"Mr. J. Schilling
2318 Canyon Dr.

Apartment Houses
Re: Properties; 312-12G
312H-14-16H
318-18G

"Termite work (treating only) completed on the above property November 12, 1948 was as follows—

"Pulled dirt away from mudsills, removed form boards and treated areas with a sodium of arsenite solution, treated rear of porches 312B-C with a solution of arsenite (sodium), treated Kaloterme termites in attic and substructure with an arsenic insecticide.

\* \* \* \* \*

Copy
Clearance

"November 15, 1948

"To the best of our knowledge the above property is now free from termites and fungi, we assume no responsibility for damage or infestation that cannot be reasonably detected without opening concealed areas or timbers.

TERMITE AND STRUCTURAL PEST CONTROL

By R. F. Van Kolken
R. F. Van Kolken"

Mr. Wice testified that about May 16, 1949, the escrow officer showed said document to him, and he (Wice) wrote the following words in the lower left-hand corner of the document: "O.K. G. S. Wice," and he accepted the document as a termite clearance. It is not asserted that the Cahoon termite report was shown to Mr. Wice, or that the portion of the Cahoon termite report known as Exhibit 4, which was in the Pacific-Schilling and Greenberg escrow, was shown to him.

About February 15, 1950, Mr. Wice learned from Mr. Feeley, his manager at the apartments, that termite infestation was there. Mr. Feeley testified that in February, 1950, during his second month as manager, he found that the apartments were full of termites; the doorsills and window casings were "eaten up," and they were like an eggshell; in March,

1950, Van Kolken inspected the property; Van Kolken said that he found a lot of termites, and he had trusted his men but they did not do the job and he believed that the work would have to be done over.

About March 7, 1950, Mr. Wice sent a letter to Van Kolken stating that he wanted Van Kolken to inspect the property and satisfy himself that there "are plenty of termites" in the building, which Wice bought on the basis of the clearance report, and that he expected the property to be cleared of termites in accordance with the report. Thereafter, in a telephone conversation, Van Kolken said he would meet Wice at the property and talk about it. They met there, and at that time Mr. Feeley was present. Mr. Wice testified that Van Kolken said that they had slipped up in doing the work and termites were there, and he was willing to make the correction and eradicate the termites. At a later date, Wice, Van Kolken, and Mr. Bonner, an investigator for the Structural Pest Control Board, were at the property. Mr. Bonner testified that he inspected the property and found termites and termite pellets there; that Van Kolken said he believed that the man who had done the work in certain parts of the attic was dependable and therefore he had not checked his work, and that he (Van Kolken) was willing to go back and treat those parts. Van Kolken testified that he made the statements which Mr. Bonner said he had made; that he also told Mr. Bonner that while the work was being done some pellets had been overlooked because they were in a hard place to get to, and if it would be satisfactory he would remove the pellets which had been overlooked and while there he would treat some new infestation which he (Van Kolken) had found. Van Kolken, as a witness, denied that he had told Wice or Feeley that his men had not done the work right and that it would have to be done over.

The court found as follows: Van Kolken was at no time an agent of the Schillings or Greenbergs. On March 16, 1949, the Schillings and Greenbergs agreed to deposit in the escrow for the benefit of plaintiffs a termite clearance issued by a licensed termite control company. When George S. Wice, Barney Greenberg and Joseph Schilling were at the escrow office, Schilling said that the defendants sellers had a termite clearance which had been issued in an earlier escrow which clearance Schilling and Greenberg accepted when they purchased this property three months earlier. Plaintiffs agreed to accept this clearance or report if it had been made within

the past five months. Thereafter an officer of the bank called Van Kolken by telephone and gave him Schilling's name. Van Kolken then mailed to the bank, on May 14, 1948, a document which evidenced a termite clearance for said property that had been issued on November 15, 1948. George S. Wice accepted this document as the termite clearance referred to in the agreement of March 16, 1949 by signing it "O.K. G. S. Wice." Prior to May 14, 1949 Van Kolken did not have any conversation with George S. Wice, or with any of his co-defendants, nor was he ever paid anything by any of said parties. Defendants, or any of them, did not represent to the plaintiffs that the property was free and clear of any termites and fungi, and they did not advise the plaintiffs that the termite report they had received was complete or accurate. Plaintiffs did not rely upon any representations of the defendants, or any of them, concerning infestation or lack of infestation of said property by termites or fungi. The defendants and each of them did not make any false statements or representations in connection with the existence of termites on the premises. Plaintiff did not rely upon any representation of the defendants in accepting the termite report endorsed "O.K. G. S. Wice." The defendants owned the property less than three months prior to March 16, 1949, and the defendants Schilling and Greenberg at no time had any knowledge that the premises were infested or infected with termites or fungi. As to Van Kolken, there was no privity of contract between him and the plaintiffs. Van Kolken had not been informed by the bank officer with reference to the reason for which his clearance was to be used.

As to the Schillings and Greenbergs, the court found, as above stated, that they did not represent to the plaintiffs that the property was free and clear of termites and fungi and did not advise them that the termite report they had received was complete or accurate; that none of them made any false representation in connection with the existence of termites on the premises. The agreement between Wice and Schilling (who attended to business for Greenberg) was that Wice would accept the "termite clearance" report which had been issued to the Schillings and Greenbergs. Said "clearance" and report were not shown to him. Those documents included the full report and recommendations that were made to Cahoon, except recommendation No. 1. The report was in another escrow file in the same bank, and presumably was available. There was no explanation at the trial as to the

reason the report was not shown to Wice or that a copy thereof was not placed in the Wice escrow. There was no explanation as to the reason the escrow officer was not called by defendants to state the circumstances regarding the failure to exhibit that report, and to explain the reason an "outline of work done [six lines of typewriting]," rather than a copy of the full report (14 sheets), was placed in the Wice escrow. Presumably the escrow officer was available as a witness. The court could have inferred from defendants' failure to present him as a witness that his testimony would have been unfavorable to defendants. Under the circumstances here, the court could have found that the full report was withheld and the "outline" was filed in lieu thereof as a part of a scheme to deceive plaintiffs as to the condition of the apartments and to obtain their approval of the so-called clearance. It would have been reasonable to conclude that if the report as to the condition of the apartments had been shown to Wice he would not have approved the statement of Van Kolken that to the best of his knowledge the property "is now free" of termites and fungi. Even though there was such unexplained and questionable conduct in connection with the escrow herein, it cannot be said that the evidence was not legally sufficient to support the findings in favor of the Schillings and Greenbergs.

As to Van Kolken, the court found, among other things, that the bank officer called him by telephone and gave him Schilling's name, and did not inform him concerning the use that was to be made of the clearance. There was no further finding as to the circumstances under which that telephone call was made or that name was given. There was no finding that Van Kolken did not know that said document which he addressed to Schilling and designated "Copy Clearance" was not to be relied upon by Schilling or someone in a pending escrow or transaction in which Schilling was a party. Van Kolken testified that he did not know Schilling; that when he (Van Kolken) was preparing the original termite report, Cahoon said that he was trading the apartments to a syndicate; later, when the bank officer stated that Schilling would like to have an outline of the work and a copy of the clearance, he (Van Kolken) took it for granted that Schilling was one of the syndicate. Van Kolken did not inquire regarding the identity of Schilling or the purpose for which the outline or the copy was to be used. It thus appears that Van Kolken knew or should have known that the docu-

ment (Exhibit 1) which he sent to the bank might be relied upon by Schilling as a member of the syndicate, or by him as a seller after having purchased the apartments from Cahoon, or by him and other persons with whom he might be transacting business pertaining to the apartments. Said document which he sent to the bank was one sheet of paper containing two paragraphs of typewriting. The first paragraph was a purported outline of the work he had done in November, 1948, under recommendation No. 2 of the Cahoon report; and the second paragraph was a purported copy of the document dated November 15, 1948 (Exhibit D—referred to by Van Kolken as a "clearance"), which he had sent to the bank in November in connection with the Cahoon-Pacific escrow, and in which he stated that to the best of his knowledge the property was free of termites and fungi. In November, 1948, when Van Kolken made and sent said document (Exhibit D) to the Cahoon-Pacific escrow, he knew that a large portion of the work which he had recommended should be done (recommendation No. 1 in the Cahoon report) had not been done. In recommendation No. 1 of the Cahoon report he specified work that should be done at a cost of $3,158.10. The work was not done, however, because Cahoon adopted recommendation No. 2 of the report. The work specified in recommendation No. 2 was done at a cost of $795.85. The difference between the amount of $3,158.10, which he proposed to charge for necessary work to be done under recommendation No. 1, and the amount of $795.85, which he charged for work done under recommendation No. 2, is $2,362.25. Said difference indicates the extensive amount of work which, according to the opinion of Van Kolken, should have been done in November, 1948. Inasmuch as Van Kolken knew that such a substantial amount of termite and fungus work had been omitted, it seems clear that he knowingly made a false certificate or representation in Exhibit D, wherein he said that to the best of his knowledge the property "is now free from termites and fungi." His recommendations, and his original and full report as to the condition of the buildings, show that said statement was not the best of his knowledge. Of course, he intended that Cahoon and the other party or parties to the Cahoon escrow should rely upon his said statement or certificate which he sent to that escrow. The document (Exhibit 1) which he sent to the bank six months later, dated May 14, 1949 and addressed to Schilling, contained a purported copy of the false statement he had sent to the

Cahoon escrow. As above stated, it appears that under the circumstances here he knew or should have known that Schilling or other persons transacting business with Schilling might rely upon said statement. That part of Exhibit 1 was labeled by him as "Copy Clearance." Furthermore, the first paragraph of said Exhibit 1, consisting of six lines of typewriting, was only a purported outline of the work he had done—it did not purport to include any part of the report and recommendations, consisting of 14 sheets of paper, wherein he had reported as to the condition of the buildings and had recommended methods of correcting those conditions.

Respondent Van Kolken argues that there was no privity of contract between him and the plaintiffs; that since the contract regarding the termite and fungus report was between Cahoon and Van Kolken and since no representation was made by Van Kolken to Wice, there was no basis for an action for damages by plaintiffs Wice. The first cause of action herein was not for breach of contract but was a cause of action in tort for damages for fraud by reason of false representations. ■ A false representation made by one person with the intention that it shall come to the attention of another person and be acted upon by him, and which is acted upon by him to his injury, gives to the person so acting the same right to relief as if the representation had been made to him directly. (See *Crystal Pier Amusement Co.* v. *Cannan,* 219 Cal. 184, 188 [25 P.2d 839, 91 A.L.R. 1357]; *Strutzel* v. *Williams,* 109 Cal.App.2d 512, 515 [240 P.2d 988].) In the Crystal Pier case, *supra,* the defendants who were pier builders, agreed to build a pier for the Crystal Pier Amusement Company and to furnish creosoted piling of a certain quality. After the pier was constructed, the title thereto was transferred to the Crystal Pier Holding Company, which proceeded to carry out the original project of building certain structures on the pier, including a ballroom. Later the holding company discovered that the piling had not been creosoted but had been treated with an inferior substance. The action therein was by the amusement company and the holding company for damages for false representations, and the defendants contended that the representations upon which recovery was sought were made to the amusement company and not to the holding company; that the holding company had no cause of action because no representations were made to it, or relied upon by it, in connection with the building of the ballroom. It was said therein at

page 188: "In the instant case we may say that the representations were reasonably intended to be relied upon by such persons as were concerned with the construction of the pier *and its improvements,* for without the ballroom and other such structures the pier would be useless; and when, as appears here, those persons (the two corporations), actually did through their officers [some of whom were officers in both companies] receive and rely upon the representations, there can be no valid objection to recovery by each." ▓▓▓ In the present case, it may be said that the representations in Exhibit 1 herein were intended to be relied upon by such persons as were transacting business with Schilling in connection with the apartments. The findings herein that Van Kolken was not an agent of the Schillings or Greenbergs, that Van Kolken did not have any conversation with Wice, and that there was no privity of contract between Van Kolken and plaintiffs, were not sufficient findings to support the judgment in favor of Van Kolken. The findings herein that Van Kolken did not represent to the plaintiffs that the property was free and clear of termites and fungi, that Van Kolken did not make any false representations in connection with the existence of termites on the premises, and that plaintiffs did not rely upon any representations of Van Kolken concerning infestation are not supported by the evidence.

Although Van Kolken may not have been under a duty to submit a statement in response to the request of the escrow agent, he did undertake to comply therewith. ▓▓▓ As stated in *Rogers* v. *Warden,* 20 Cal.2d 286, at page 289 [125 P.2d 7], "[A]lthough one may be under no duty to speak as to a matter, 'if he undertakes to do so, either voluntarily or in response to inquiries, he is bound not only to state truly what he tells but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all he must make a full and fair disclosure.'"

▓▓▓ The endorsement, "O.K. G. S. Wice," on the so-called clearance did not constitute an approval of false representations, nor did it constitute a waiver of a right to recover damages by reason of such representations.

▓▓▓ At the oral argument on appeal, defendant Van Kolken made a motion for permission to file, as additional evidence, a photostatic copy of the grant deed whereby the Schillings and Greenbergs conveyed said property to plaintiff Marian Lois Wice. Van Kolken asserts that said copy of the deed is conclusive evidence that appellants were not induced

to complete the transaction by reason of reliance on Exhibit 1 (the alleged clearance), since said copy will show that the deed was recorded on May 13, 1949, which was one day before Van Kolken mailed Exhibit 1 to the escrow agent and, of course, was before appellants could have seen the exhibit. The deed was sent to the recorder by the escrow agent, and there is no evidence that plaintiffs or either of them actually knew it had been recorded or delivered to the recorder's office for recording prior to the time Mr. Wice saw Exhibit 1. The motion for permission to file the deed is denied.

The judgment is affirmed as to defendants Schilling and defendants Greenberg. Judgment is reversed as to defendant Van Kolken.

Shinn, P. J., concurred.

Vallée, J., did not participate.

A petition for a rehearing was denied May 24, 1954.