Lloyd E. TWING and Ethel B. Twing,

Husband and Wife, Appellants

(Plaintiffs below),

v.

William E. SCHOTT and Helen Schott,

Husband and Wife, Appellees

(Defendants below).

No. 2857.

Supreme Court of Wyoming.

April 29, 1959.

338 Pac.2d 839

102

Lonabaugh & Lonabaugh, R. H. Bennett and E. E. Lonabaugh, Sheridan, for appellants.

Harry E. Leimback and Robert Jerry Hand, Casper, for appellees.

Before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

104

## OPINION.

Mr. Justice PARKER delivered the opinion of the court.

Lloyd E. and Ethel B. Twing, husband and wife, brought an action against William E. and Helen Schott, husband and wife, seeking on the grounds of fraud and concealment to rescind a Standard Purchase Offer, Acceptance and Receipt for the purchase of real property occupied as a trailer court and to recover a $6,000 down payment.[1]

In summary the facts show that the Twings, whose attention had been attracted through a newspaper advertisement, contacted the Schotts at the trailer court, discussed the matter of purchase, signed the instru-

---

[1] Merrill D. Jenkins, realtor, and W. W. Gruenig, salesman, were originally joined as defendants, but the action against them was later dismissed.

ment, made the down payment, and took possession of the property. They later complained that neither the sewage system nor the water for the premises was as represented and ultimately brought the suit comprising two causes of action, the first seeking relief because of misrepresentation as to the sewage system and the second because of concealment as to the water for the place. The court found that plaintiffs had failed to sustain the allegations of their petition and entered judgment for defendants. Plaintiffs have appealed, asserting as error the finding that they failed to sustain the allegations of their petition, the general finding against them, and the court's rulings on various evidentiary matters.

Basically, plaintiffs' appeal contends that defendants represented the property to have a good and adequate sewage system with two 1,000 gallon septic tanks and one 5,000 gallon drainage tank, all workable and satisfactory; that said representations were false and known to be so by defendants, and were material factors in influencing plaintiffs to buy; that plaintiffs were ignorant of the falsity of the representations, had a right to rely and did rely on them, and were damaged in consequence; that as to the water supply defendants' superior knowledge of the facts imposed on them a duty to disclose all material facts but that nevertheless certain material facts were undisclosed and plaintiffs were damaged as a result of the concealment.

As in all appealed cases, we must assume that evidence in favor of the successful party is true, must not consider evidence of the unsuccessful party in conflict therewith, and must give to the evidence of the successful party every favorable inference which may reasonably and fairly be drawn therefrom. Schaffer v.

Standard Timber Co., Wyo., 331 P.2d 611; Parkinson v. Roberts, Wyo., 329 P.2d 823; and Strom v. Felton, 76 Wyo. 370, 302 P.2d 917.

The foregoing rule becomes somewhat stricter in its application in cases wherein fraud is charged, and we have repeatedly held that one who alleges fraud must prove the same clearly and distinctly enough to satisfy the mind and conscience that the fraud exists. Moreover, fraud will not be imputed to any party when the facts and circumstances out of which it is supposed to arise are consistent with honesty and purity of intention. Havens v. Irvine, 61 Wyo. 309, 157 P.2d 570, 574, 159 P.2d 366. See also First Nat. Bank of Green River v. Barrett, 54 Wyo. 394, 93 P.2d 510; Williams v. Yocum, 37 Wyo. 432, 263 P. 607; 23 Am.Jur. Fraud and Deceit § 22.

One other rule is particularly significant in the consideration of a case of this nature: This court may not substitute its conclusions for the findings made by the lower court. Lucksinger v. Salisbury, 72 Wyo. 164, 262 P.2d 396, 264 P.2d 1007.

In the light of these rules we look to the evidence upon which plaintiffs rely to prove the misrepresentations and concealment which they allege. Such reliance is placed primarily upon the conversation taking place prior to the execution of the purchase agreement and the evidence of what the circumstances actually were at the time. Plaintiffs' witnesses give their version of what was said, and this does not agree entirely with the testimony adduced by defendants. The condition of the property, especially that of the sewage system and the water supply, was discussed by various witnesses but particularly by defendant Schott and by Homer Troutt, a master plumber. We think there is

no occasion to set forth all of the testimony in detail.
That adduced by plaintiffs tended to show that defend-
ants represented to them that the sewage system was
good and the water was furnished by the City of Sher-
idan, whereas in fact the sewage system was unwork-
able and the water, furnished by a private company,
was subject to additional charges. Defendant Schott
testified that he, with two other persons, had installed
the sewage system without previous experience, ac-
cording to "data that he [the owner of the Sheridan
Concrete Block and Pottery Works] had from the Port-
land Cement Company out of Denver, Colorado, on
septic tanks," that the tanks were of the size repre-
sented, and that he had explained to the buyers diffi-
culties regarding the excessive use of water by the
tenants and the dropping of rocks in the sewage system
by children. He maintained, however, that the system
was satisfactory. As to the water supply, he said he
had shown his receipts to plaintiffs, thereby indicating
that the water was furnished by a private company
rather than the City of Sheridan and that in any event
the plaintiff Twing, following the execution of the con-
tract, attended a meeting of the water company and
agreed to cooperate.

The portions of the evidence which were conflict-
ing can receive no consideration here, but testimony
which stands uncontradicted and unimpeached cannot
be ignored by a trial court. Beck v. Givens, 77 Wyo.
176, 309 P.2d 715, 717, 313 P.2d 977. We refer then
to such portions of the record as seem to be germane.

Schott's statements on cross-examination are signifi-
cant as to the sewage system:

"Q. And do you recall telling him [Twing] that
you had a good sewage system at that time? A.
Yes.

"Q. And do you recall telling him that the tanks drained properly? A. They did.

"Q. Do you recall telling him that you had no trouble with the sewage system? A. No. I told him I had trouble with the sewage system but it wasn't no trouble related to the sewage system alone. It was trouble that children would do, such as drop rocks into the sewers and stuff and we'd have to have it rodded.

\*     \*     \*     \*     \*     \*

"Q. And you did stress \* \* \* that this thing [sewage system] worked good? A. Yes, to my knowledge, it did.

\*     \*     \*     \*     \*     \*

"Q. Was the word 'adequate' the only description used of your system? A. I don't truthfully remember whether it was 'adequate' or 'sufficient'.

"Q. Did you say that all the neighbors were having trouble with their systems but you didn't because it was new? A. Up to that point I had no trouble with my system, as far as my system was concerned. To my knowledge, I had no trouble with my system.

"Q. Just answer 'yes' or 'no'. Did you make that statement? A. I don't remember.

"Q. How many times previous to this meeting on the evening of February 23rd had you pumped your cesspool out? A. I had pumped the cesspool three times from the date I bought it until the day I sold it. And my son had pumped it once.

\*     \*     \*     \*     \*     \*

"Q. Isn't it true, Mr. Schott, that you were pumping out this main tank about once a week or more for some time before you sold this property to the Twings? A. I pumped the main tank, yes."

As to the water for the property, Schott testified:

"Q. What was said concerning the water bills? A. Well, he asked me what kind of water I had. Now, I thought he was asking whether I was getting well water or what water and I told him, 'City water.'

"Q. Well, were you getting city water? A. From the Suburban Water Company. The Suburban Water Company buys water from the city and resells it out of the city.

\*          \*          \*          \*          \*          \*

"Q. You didn't tell him that you had a lawsuit against Mr. and Mrs. Foss [the persons from whom the Schotts had purchased the real property] concerning some shares of stock [in the Suburban Water Company]? A. No, I didn't tell him that.

"Q. Did you tell your agent anything about this lawsuit or the water situation with the company? A. No, not that I can recall."

Homer Troutt testified that he was a master plumber; that he looked over the place and made an investigation. He was the only witness who purported to be an expert on the subject of sewage disposal. The following portions of his testimony, although somewhat disconnected and occasionally lacking in meaning, were not contradicted directly.

"Q. Now, between the first time in March that you went down and late in April or May, did you go down at any time to look over some septic tanks or some supposed septic tanks and cesspool? A. Well, they [the Twings] was having sewer trouble and I went down and I explained to them that

there wasn't adequate drainage in the leaching pit * * * in other words, it would be the cesspool.

*       *       *       *       *       *

"Q. Based upon your experience, what was wrong with the leaching pit or 'cesspool' as you call it? A. Well, my experience in that end of the town, you have to go between 14 and 15 feet to get into the flow of sheet water that comes off the hill and from the south part of the town. There's a stratus of gravel down there about 12½ or 13 feet but it's not a thick vein; and you get a little surface water, but very little. And when you break through that, why, then you get into your drainage. In other words, —

"Q. In other words, it was your opinion that this wasn't draining because it wasn't far enough down? A. That's right.

"Q. Now, was there anything else wrong with it, with reference to its location? A. Well, the location was just vice versa of where it should have been located.

"Q. Why do you say that? A. Well, the water comes down and water will seek its own course; and it's going towards the river, all of that water for drainage. And they run it against the hill level is what they run against.

"Q. In other words, it would be better to have it on the other end, the west end of the lot, where it was lower? A. That's right.

"Q. Did you give an estimate at that time as to what would be necessary to make the thing work properly? A. Well, I told Mr. Twing that I would have to dig out back of the little log garage, I be-

lieve it is, there. And I also told him that I'd have to go down possibly 15 feet to hit what I wanted for a leaching pit.

"Q. And what would the cost of this be to connect up with pipes, and so forth and so on? A. Well, to replace all that and turn it all around—which the stuff that's in the ground would cost you more to dig it up than it would to replace it with new—I told him it would cost in the neighborhood of $2500.00 to get him drainage.

\*       \*       \*       \*       \*       \*

"Q. Can you have a septic tank without having baffles? A. No, sir.

"Q. And did you find any baffles in these two [septic] tanks? A. Not that I could find. The water was deep. If there was any in there, they was very small.

\*       \*       \*       \*       \*       \*

"Q. Were you able to determine whether or not the tank would hold 5,000 gallons? A. It definitely would not.

"Q. And with reference to the working area, what relationship would it have to the size of the tank? A. Well, the upper part of the tank was useless to put in. It wasn't doing nobody no good. Anything above the sewer lines is useless at all. It's just absolutely no good. It's from the sewer line down to the bottom of your tank is your working capacity.

"Q. What was the construction of this tank? A. Cement blocks.

"Q. Were there spaces between the blocks that you could find? A. No, they was laid up solid.

"Q. What do you ordinarily do with these blocks? A. Turn them sideways to give them waterway.

"Q. In other words, allow water to seep out? A. That's right, through the holes.

\*       \*       \*       \*       \*       \*

"Q. Now, after looking at all of this sewage system under the houses and out where the trailers were—and excluding the tanks, to fix the tanks up, that you already said would probably cost around $2500.00—how much money in your opinion would it take to put the sewage system on this place in proper order? A. Between 5,000 and $5500.00, and then I would be very skeptical about it.

"Q. Now does that include these tanks here? (indicating) or does it not include them? A. That would include them."

It has often been held that a false representation in order to be actionable must relate to a matter of fact rather than of opinion and the distinction between fact and opinion is not always definite and depends upon the factors of each case. See generally 23 Am.Jur Fraud and Deceit § 27 ff; 37 C.J.S. Fraud § 10; 5 Williston on Contracts, 1937, § 1491 ff. The words of defendant Schott that the sewage system was "good" and either "adequate" or "sufficient" could not have been other than a fraudulent misrepresentation. We think his words constituted more than a puffing statement and more than any opinion. It was wholly inconsistent with the fact that he had repeatedly, according to his own admission, pumped out the cesspool. In that connection, it does not appear by testimony or otherwise that the purported dropping

of rocks in the line would cause the cesspool to fill. It is true that the cesspool might have filled by reason of the use of excessive water by the tenants but if this were the fact then there would seem to be no excuse for failing to tell the prospective purchasers of the pumpings of the cesspool. It is said in 5 Williston on Contracts, 1937, § 1498, p. 4185, "It is certainly true that any active conduct or words which tend to produce an erroneous impression may amount to fraud, and half the truth may be a lie in effect."

Even when a party is under no duty to speak regarding a matter, if he does speak, he must speak the truth and make a full and fair disclosure. Gillespie v. Ormsby, 126 Cal.App.2d 513, 272 P.2d 949; Wice v. Schilling, 124 Cal.App.2d 735, 269 P.2d 231; Bank of America Nat. Trust & Savings Ass'n v. Greenbach, 98 Cal.App.2d 220, 219 P.2d 814; Deardorf v. Rosenbusch, 201 Okl. 420, 206 P.2d 996; Esau v. Briggs, 89 Cal.App. 2d 427, 201 P.2d 25; In re Dryden's Estate, 155 Neb. 552, 52 N.W.2d 737; Ehrlich v. Real Estate Commission, D.C.Mun.App., 118 A.2d 801; and Parker v. Title & Trust Company, 9 Cir., 233 F.2d 505.

To the same effect is A.L.I. Restatement, 1938, Torts § 539:

"(1) A statement of opinion in a business transaction upon facts not disclosed or otherwise known to the recipient may reasonably be interpreted as an implied statement that the maker knows of no fact incompatible with his opinion."

The discussion in 3 Pomeroy's Equity Jurisprudence, 5 ed., § 901a, is significant:

"If in addition to the party's silence there is any statement, even any word or act on his own part,

which tends affirmatively to a suppression of the truth, to a covering up or disguising the truth, or to a withdrawal or distraction of the other party's attention or observation from the real facts, then the line is overstepped, and the concealment becomes fraudulent. The maxim is, *Aliud est celare, aliud tacere*. Although a party may keep absolute silence and violate no rule of law or equity, yet if he volunteers to speak and to convey information which may influence the conduct of the other party, he is bound to discover the whole truth. A partial statement then becomes a fraudulent concealment, and even amounts to a false and fraudulent misrepresentation."

Perhaps the obligation of a party to make a full and fair disclosure if he discloses at all is also applicable to the words of defendant Schott regarding the water which was to be used on the premises. True, his statement was somewhat equivocal; and when he said that it was "city water" he may have in a manner of speaking been giving it a proper designation since the water was originally brought through the city lines, but the fact of there having been at that time some trouble and misunderstanding about the water would seem to have placed upon him in all fairness an obligation to disclose all facts.

While we are always reluctant to reverse a judgment unless it is clearly against the weight of the evidence,[2] neither this nor any appellate court ought ever to hesitate about a reversal whenever it is apparent that the judgment is contrary to the law and contrary to the evidence. McNamara v. O'Brien, 2 Wyo. 447.

---

[2] Globe Mining Company v. Anderson, Wyo., 318 P.2d 373; Columbia Copper Min. Co. v. Duchess Mining, Milling & Smelting Co., 13 Wyo. 244, 79 P. 385.

The judgment of the trial court, being contrary to the uncontradicted and unimpeached evidence, is reversed, and the case is remanded for further proceedings not inconsistent with the views herein expressed.

Reversed and remanded.