**Thomas J. MURPHY d/b/a Murphy's Gillette Drug, Maryland Casualty Company, and Sun Insurance Company, Appellants (Plaintiffs below),**

v.

**PETROLANE–WYOMING GAS SERVICE and McCulloch Gas Transmission Company, Appellees (Defendants below).**

No. 3789.

Supreme Court of Wyoming.

May 22, 1970.

Rehearing Denied July 1, 1970.

Thomas E. Lubnau, Gillette, for appellants.

Edward E. Murane and G. G. Greenlee, of Murane, Bostwick, McDaniel, Scott & Greenlee, Casper, for Petrolane-Wyoming Gas Service.

Morgan & Brorby and Wade Brorby, Gillette, for McCulloch Gas Transmission Co.

Before GRAY, C. J., and McINTYRE, PARKER, and McEWAN, JJ.

Mr. Justice PARKER delivered the opinion of the court.

On March 4, 1966, the Gillette drugstore of plaintiff-Murphy was destroyed by fire, occasioned when he attempted to light a water heater in the basement. He and his two insurers sued Petrolane-Wyoming Gas Service, distributor, and McCulloch Gas Transmission Company, the one furnishing gas to the distributor, for $115,000 damages,[1] alleging, inter alia, express and implied warranty and negligence in (a) allowing casinghead gasoline to enter the supply line thereby causing the fire and (b) failing to warn Murphy that liquefiable hydrocarbons had condensed into casinghead gasoline and to give adequate instructions and directions after the condensation became apparent to defendants. There was a general denial and among other defenses Murphy's sole and contributory negligence was asserted. The court found that there had been no breach of warranty either express or implied and that plaintiff was barred from recovery because of contributory negligence, entering judgment against plaintiffs.[2]

On appeal plaintiffs urge the court's error in failing to find a breach of express warranty against Petrolane and of implied warranty against both Petrolane and McCulloch; insist that the defendants were strictly liable to Murphy (a) in tort and (b) as a matter of law for the damage by their negligence, which in no way was contributed to by Murphy; and further complain that the trial court erred in not allowing evidence of post-accident changes in the design of McCulloch's transmission line.

1. The amount was later reduced by stipulation to $99,134.68.

2. Judgment for $1,684.56 in favor of Petrolane against McCulloch was also entered but is not here in issue.

There was no dispute in the facts which led up to the fire:

McCulloch had a gas distribution system, including a six-inch transmission pipeline from Rockypoint Field in northern Campbell County to the Raven Creek Oil Field west of Moorcroft. Its source of gas also included a field some forty miles along its main line and the Kern County Land Company plant north of Rozet, which was adjacent to the 30-mile Gillette extension constructed by McCulloch during the late summer and early fall of 1965 and which consisted of four and three-inch pipe from a point north of Moorcroft to Gillette. A fifth of the six-inch pipeline and about a half of the extension were buried, the remainder being on the surface. A natural gasoline plant was located at Rockypoint, which removed liquefiable hydrocarbons from the natural gas before sending it to the pipeline.[3] The first line included a pigging arrangement, that is, a rubber sphere launched at Rockypoint, which gas pressure would move through the line to the pigging station west of Moorcroft, requiring anywhere from eight hours to thirty days to traverse the line. After March 4 the sphere did not pass the West Moorcroft Field for three or four days (which would logically seem to indicate amounts of liquid hydrocarbons pushed ahead of it into the Gillette line at the time of the difficulties). Approximately 500 barrels of liquefiable hydrocarbons were recovered at the separator at Moorcroft during a year, one to two hundred barrels having been recovered at one time. These liquid hydrocarbons were sold as natural gasoline. No drips were installed in the McCulloch line, and there was no arrangement for the sphere to be used in the extension line to Gillette. Petrolane purchased from McCulloch with de-livery at its plant in Gillette and maintained a distribution system there to various customers, including Murphy. About 11:30 a. m., March 3, 1966, Petrolane's alarm indicated a drop in pressure, the weather conditions then and immediately previous having been windy and cold (around zero degrees Fahrenheit). Lower hydrocarbons normally in a liquid state are soluble, and in lighter hydrocarbons like methane they exist as a gas with the higher hydrocarbons, the vapor pressure of the mixture determining whether they exist in a gaseous or liquid state—temperature having a definite effect on the vapor pressure, i. e., the colder it is the more condensate. When the alarm system went off on the morning of March 3, Petrolane's local manager, Forster, contacted McCulloch's pipeline superintendent, Elledge, who took steps to increase the pressure. That evening Forster and his crew discovered liquids in their lines. They blew a line at the Sands Motel, again contacted Elledge, and started up their auxiliary system, which was employed in part during the night of March 3 and 100 percent from the morning of March 4 continuing until the afternoon when the load started and they began again to use from McCulloch. Forster was told by Elledge that if some liquid had in fact come into Gillette it was probably in the form of a "slug." About ten days before the trouble in Gillette, McCulloch had been aware there had been some liquids in the line sufficient to cause difficulties at the U. S. Smelting plant, located on the Gillette extension some ten miles after the takeoff from the main line.

During the evening of March 3 Petrolane employees made two residential calls in addition to the one to the Sands Motel, and in the early morning of March 4 were sum-

---

3. "There are two general types of natural gas: (1) 'dry' gas, which consists principally of methane * * * with a small content of ethane * * * and nitrogen, and (2) 'wet' or casinghead gas, which contains besides methane varying amounts of the heavier hydrocarbons. The dry gas is the chief type produced in most localities. It does not contain any appreciable amount of readily condensable gasoline and is not usually closely associated with petroleum. Wet or casinghead gas contains condensable gasoline. It is characteristically associated with petroleum and is yielded with the oil in many wells. It also comes from the gas wells in oil pools * * *." 1 Kuntz, Oil and Gas, p. 35 (1962).

moned to the Gillette Bakery, across the alley from Murphy's drugstore. Forster went into the basement to see if the pilot lights were out, removed the meter nuts and found the meter full of liquid. Following some preliminaries, he took out about thirty-five gallons of oily, flammable material, and after relighting at the bakery left between 4:30 and 4:45 a. m. He then called Plunkett of the Corner Drugstore, north of Murphy's, who came to his store, and Forster reinstated service there. Between 5:30 and 6 a. m., he called Murphy at home, awakening him, and told him they had a problem with the system and were sure his pilot lights were out and said they would like to get in his drugstore to reinstate service. Forster thought he also said they would like to do this so that it would be warm when he opened the store and was concerned that the pipes might freeze. He testified further, "I called Mr. Murphy * * * and told him that we had had some problem with our system and were quite sure that his heating equipment was off in his drugstore and we would like to have access to the store to relight his equipment and warm the * * * (stopping)." Murphy said he was sleeping when he received Forster's call at approximately 6 a. m. and when Forster said he would like to have Murphy come down to the store and let him in so they could check the pilot lights, Murphy queried the reason and was told they were having some trouble in the alley with their lines. Murphy asked if it could not wait until 7:30 a. m. when the store would be open and Forster said he would like to get in and check as there might be some pipes freeze. Murphy replied that he didn't think they would freeze in an hour and a half, and that an employee would open the store at 7:30 a. m. When Forster indicated they would like to get in the store at that time, he said he received only a vague reply from Murphy.

During the morning, Forster serviced various other customers, at two of which there were flash fires. Meanwhile at 7:30 a. m. Charlotte Heinrich, an employee of

Murphy, had opened the drugstore. She called Petrolane shortly after 8 a. m., asking them to light the water heater and furnace, and was advised that someone was working in the alley, and to the best of her recollection she called again later requesting the service.

Murphy arose at approximately 8:30 a. m. and arrived at the store at 9:15 a. m. His employees complained of the cold and that there was no hot water for the dishes. He inquired if Petrolane had been there yet and when advised in the negative went to the basement and attempted to light the hot water heater. He said that after removing the covers from the place of access to the pilot on the heater he saw that the pilot light was out. He then turned the control valve to the pilot position, lit a match, depressed the red button which controlled the gas to the pilot, touched the match to that area, and after what he thought was a minute took his thumb off. He did not hear the characteristic sound of the pilot burning, looked, and saw a ball of flame approximately the size of a tennis ball in the area of the pilot. He did not turn the water heater control to off, attempted to suppress the fire by blowing it out, almost succeeded, but ran out of breath. He then noticed there was a stream of fire descending to the floor from the pilot area. It reached the floor, a distance of some eight to ten inches, and formed a path less than an inch in width somewhat to the right of the heater. Cardboard cartons were located approximately three feet from the water heater and these caught fire. Murphy ran upstairs, hollered that there was a fire in the basement and to call the fire department, grabbed an extinguisher in the rear of the store, returned to the basement, and attempted to put out the conflagration. He had it almost suppressed but the fluid in the extinguisher became depleted. When he first went into the basement, he did not notice the odor of gas. In attempting to light the pilot, he was down on one knee and did not detect any fluid on the floor.

## EXPRESS WARRANTY

Plaintiffs first argue that the court erred in failing to find a breach of express warranty against Petrolane, listing as one basis the newspaper accounts regarding the Petrolane plant, which was to be installed in the town. However, no authority is presented as holding that an express warranty can be so predicated, and we think the point merits no serious consideration. They also argue that inquiry was made as to economy, safety, and controls of the product by Murphy, but examination of the record discloses little in that respect. Plaintiffs cite Murphy's version of his conversation with Petrolane's employee, Nelson: "I'm fairly certain he said 'the economy of it,' that it would be approximately 30 percent cheaper." Asked if there was anything said with respect to safety he answered, "Other than that I asked him if it worked just as well [as propane], and he said 'yes.' * * * I asked him if it worked just as well as the system that I was on. * * * And he says, 'As long as we make the necessary changes in the controls,' * * *." We find such representations wholly insufficient to constitute an express warranty.

## IMPLIED WARRANTY

Plaintiffs next contend that the court erred in failing to find a breach against both Petrolane and McCulloch of an implied warranty of merchantability and fitness for the purpose furnished. Petrolane concedes such an implied warranty existed; and McCulloch, although taking no direct position, meets the situation by arguing that if there was a breach it was not the proximate cause as Murphy was contributorily negligent, assumed the risk, or operated as an independent intervening cause. McCulloch also raises the matters of lack of (a) privity and (b) notice required by § 34–2–607, W.S.1957 (1969 Cum.Supp.).

Since Petrolane directly and McCulloch tacitly admit the existence of an implied warranty, merchantability, and fitness for the purpose furnished, we so assume and analyze the questions of privity and lack of notice. Regarding the former, slight attention need be devoted to that aspect since McCulloch's counsel recite that among the exceptions to the privity-rule requirement is that relating to a product which is inherently dangerous, containing a hidden defect or concealed danger. This feature is, of course, the nub of the case and whether or not defendants used requisite care is a matter which can be resolved by analysis of all the circumstances of the fire viewed in proper legal perspective. It has often been said that gas is a highly dangerous substance, requiring a commensurate degree of care on the part of dispensers, and even the most conservative authorities agree that gas companies should take every reasonable precaution suggested by experience to avoid known dangers. 3 Thornton, Oil and Gas, §§ 1078–1080 (1932).

The argument as to lack of notice is scarcely worthy of comment since it is unsupported by any authorities, and there is only the bald assertion that Murphy by his own admission failed to give notice of the breach of warranty required by statute. Petrolane does not agree that notice is a prerequisite to this particular breach of warranty action on the ground there was no opportunity for the buyer to accept or reject the product and no acceptance as defined by § 34–2–606, W.S.1957 (1969 Cum. Supp.). However, as observed by the court in DiPangrazio v. Salamonsen, 64 Wash.2d 720, 393 P.2d 936, 937:

> "The Uniform Sales Act requirement of notice * * * may be a sound commercial rule designed to protect the seller against unduly delayed claims for damages, but were it applicable in a case such as this, it would be a misapplication of the statute and become a 'booby trap for the unwary.' * * * "

## AVAILABILITY OF "CONTRIBUTORY NEGLIGENCE" AS A DEFENSE TO WARRANTY

It is our view that both Petrolane as the retailer and McCulloch as the whole-

saler impliedly warranted the gas to be merchantable and fit for the purpose intended. The pivotal question of whether there can be a valid defense to an action under breach of warranty is more complicated. Plaintiffs would have us believe that negligence on the part of the user of a product is no defense in a breach-of-warranty action against a manufacturer or seller, citing Simmons v. Wichita Coca-Cola Bottling Company, 181 Kan. 35, 309 P.2d 633; and Challis v. Hartloff, 136 Kan. 823, 18 P.2d 199. Defendants on the other hand, recognizing that there is a lack of unanimity of decision in this area, say that the better rule dictated by logic and fairness makes tort defenses available in a warranty action, and refer to 1 Hursh, American Law of Products Liability, § 3:9, p. 416; and Annot., 4 A.L.R.3d 501, as indicating there is a wide divergence of opinion among courts as to the propriety of allowing the defense of contributory negligence in products-liability cases. One of the difficulties in precluding such defense is the consequent deprivation of an opportunity to show that the real cause of the injury was from another source than the agency furnishing the product. Without attempting to mathematically list the majority of holdings on this aspect or to collate and analyze them, we conclude that a blanket exclusion of contributory negligence as a defense in breach-of-warranty cases is unjustified, especially when as in Wyoming distinctions between assumption of risk and contributory negligence have not been adopted. Ford Motor Company v. Arguello, Wyo., 382 P.2d 886, 891. Accordingly, in resolving the present controversy wherein we find the evidence to disclose an implied warranty by both the wholesaler and retailer of the gas[4] the propriety of the judgment must depend upon the existence of an intervening cause of the injury as well as the existence or nonexistence of contributory negligence (or assumption of

risk). Thus no credence is given to plaintiffs' argument that Petrolane and McCulloch are strictly liable to Murphy in tort or that they are so liable as a matter of law. The determinative part of the litigation depends upon the evidence to support the contentions of the defendants in the trial court and the findings there that plaintiff-Murphy was guilty of contributory negligence or assumption of risk and that the temporary presence of liquefiable hydrocarbons in the systems of the defendants as such did not damage plaintiff-Murphy's property nor could it except in combination with an intervening force or independent acts entirely beyond the control of the defendants.

## DEFENDANTS' NEGLIGENCE

■ Notwithstanding the possibility of resolving the controversy on the basis of breach of warranty of the defendants, the matter of their negligence or nonnegligence is one deserving comment. The findings merely said, "The court is not persuaded that plaintiffs have proved by a preponderance of the evidence that the defendants were negligent," with no delineation or explanation. As we discussed earlier in reciting the pertinent facts, there were no drips in the approximately fifty-mile line of McCulloch from Rockypoint past the bifurcation near Moorcroft to the point where the gas was turned over to Petrolane at Gillette. The sphere traveled from Rockypoint past the extension and even Elledge admitted it was possible for "a small amount" of liquid to go into the Gillette line. That this is an overminimization is indicated by the fact that Petrolane's manager removed thirty-five gallons of liquid from the bakery meter alone. Some effort was made to show by the witness Stinson that the McCulloch line was "designed and constructed in accordance with accepted established engineering practices," but on

4. The trial court's findings on this point were ambiguous: "The court is not persuaded that there was a breach of warranty, express or implied, which would give rise to the damages * * *. * * A breach of warranty, if any, appears to be insubstantial and not directly related to the damage sustained by plaintiffs."

cross-examination he acknowledged that perhaps as previously testified by Petrolane's witness, Stewart, the line should have been buried except that it was not feasible because "the whole project was very borderline," and said that the large amounts of liquid (referring particularly to that at the bakery) was not required to be extracted because it would be "uneconomic processing" to remove it. When queried about the need and feasibility for a drip on the line from the takeoff toward Gillette, which had been estimated to cost in excess of $1,000, he equivocated by saying "[that] would be, I think, a legal decision as to whether it should be installed by McCulloch or a much cheaper unit started by Petrolane because of the lower pressures." Mullins, McCulloch's foreman at the time of the operations conducted in the Gillette area, testified that during a conversation with McCulloch's superintendent and the contractor's foreman, he was told that drips would not be installed on the line to Gillette since "the gas being supplied to Gillette would be dry and there wouldn't be need for drips."

As to any mechanism for removing liquids from the gas after it reached Petrolane, its manager, Forster, testified there was no "drip" in their distribution system itself but that one was located at its side of the city gate immediately behind the receiving point with valves that could shut off the gas supply, but the testimony shows this was not used before or during the March emergency.

In the statement of facts we recited the uncontroverted actions of Petrolane's representatives when they discovered the emergency, Forster's call to Murphy, and the response. It is indeed surprising that Forster should gloss over the difficulty when contacting a customer by merely saying they "had some problem" with their system, were sure his pilot lights were out, and would like to get into the store to reinstate service. Not to tell the customer that he should not attempt to relight his pilot lights or that there was danger can scarcely be justified in view of Forster's statement, "I felt there was no danger in handling this *if we handled it.*" (Emphasis supplied.) This facet is even worsened by the circumstance that prior to the time the Murphy fire broke out Petrolane's manager had experienced two flash fires during attempts to relight pilots. In view of this testimony, the court's negative finding that plaintiffs had failed to prove by a preponderance of the evidence that defendants were negligent cannot stand.

## MURPHY'S CONTRIBUTORY NEGLIGENCE

▮▮▮▮ Bearing in mind the events recounted and the lack of showing that Murphy was told or knew that there was a dangerous situation, we are unable to reconcile the finding that "It is true that the manager did not delineate in detail the exact nature of the trouble but a prudent man should have been put on notice that the problem was not routine nor transient in nature." Apparently the court assumed that if one is advised of a problem not routine nor transient he is thereby informed of danger. We think such assumption is unwarranted and erroneous. A plaintiff who exposes himself in disregard of warnings when an ordinarily prudent man similarly situated would not is guilty of negligence but such a warning must be definite in order to be properly considered as informing him of the danger,[5] and when the facts are undisputed the contributory negligence becomes a matter of law.[6]

▮▮▮▮ Certain other unsupported findings are worthy of note:

"* * * Plaintiff Murphy declined an offer of help and made it impossible for

---

5. Shilagi v. Degnon-McLean Contracting Co., 71 App.Div. 152, 75 N.Y.S. 540, 541 (affirmed 173 N.Y. 625, 66 N.E. 1116); 65A C.J.S. Negligence § 120(3).

6. Wyoming Farm Bureau Mutual Insurance Company v. May, Wyo., 434 P.2d 507, 511.

Petrolane to correct the situation which it was prepared to do.

"* * * It could not be expected that Petrolane would be waiting at Plaintiffs' [sic] door not knowing when the store would be open, considering that there were other business [sic] to service."

Murphy did not make it impossible for the situation to be corrected nor was Petrolane's manager unaware of when the store would open. Murphy was definite that Forster was informed it would be open at 7:30 a. m., and indeed his employee did arrive at that time. Forster testified:

"Q Did he [Murphy] give you any instructions for access into the store? A He said something about a lady that was working there that would—I forget, I believe it was—at 7 o'clock be going to church and then after church she usually went directly to the store.

"Q And what time did he tell you you should be at the store? A I believe it was 7:30, if I'm not mistaken on that.

* * * * * *

"* * * He said that his employee, which was Charlotte Heinrich—I didn't recall before—would be going to church at 7 o'clock and after church she would immediately open the drugstore, which would be approximately 7:30. And there wasn't a statement made as to that he expected me to meet her at 7:30. He just said that she would open the drugstore at 7:30."

The court also found:

"There appears to have been no compelling reason to immediately light the water heater. It seems that a prudent man would have made an effort to contact Petrolane crews in the alley and obtained their assistance."

The record shows that after opening the store at 7:30 a. m., Mrs. Heinrich waited until after the arrival of another employee before calling Petrolane shortly after eight. It was her recollection that she had also made a second call to them. When Murphy arrived at the store after 9 a. m. his employee who had been there since 8 a. m. had been unable to accomplish her dishwashing task because of lack of hot water. We seriously question whether a prudent man under these circumstances would have done other than Murphy in taking it upon himself to light the pilot.

The court in its finding said that Murphy was negligent in the manner in which he attempted to light the pilot:

"Perhaps Murphy should have taken a readily available fire extinguisher with him into the basement. Shortly after Murphy attempted to light the pilot light a malfunction appeared and he saw a small ball of fire in the vicinity of the orifice. No reason appears at this time why plaintiff could not have turned off the valve and shut off the supply of natural gas. Plaintiffs [sic] own witness was of the opinion that the valve could have been turned off at this juncture. There is no indication that plaintiff panicked or acted in an emergency situation. Plaintiff Murphy next attempted to blow out the flame with his breath. In his own words he nearly succeeded but ran out of breath. It is evident that the malfunction did not result in an extremely dangerous situation because the fire was almost extinguished with plaintiff's breath. After the unsuccessful efforts of plaintiff the fire proceeded in a narrow line from the vicinity of the pilot light a short distance to combustible material stored in basement by plaintiff. Plaintiffs [sic] efforts to extinguish the resulting larger fire with a fire extinguisher failed after the extinguisher became depleted. Were it not for the combustible materials adjacent to the hot water heater the fire likely would have run along the cement floor and done no damage. * * *"

Aside from the unjustified assumption that Forster warned of the danger, it would appear Murphy was found negligent because he should have (1) taken a fire extinguisher with him to the basement, (2) turned off the valve and shut off the sup-

ply of gas, and (3) not have stored combustible materials adjacent to the hot water heater. Since as we have noted Murphy had no reason to believe it could be dangerous for him to attempt to light the pilot of his hot water heater, his failure to take with him a fire extinguisher would have the appearance of the actions of a prudent man, and we see no basis there for a finding of negligence. Concerning his leaving the heater control on "pilot," no evidence was adduced this would have in any way affected the situation. The testimony of an expert, the only witness who addressed himself to this aspect, was that a certain amount of vaporization would have continued even had the control been turned off. As to the storage of combustible materials, the record reflected that the cement floor was clean and free of debris between the hot water heater and the cartons, three feet distant. It would, undoubtedly, be good practice to be particularly careful in such matters, but there was no evidence indicating the condition of the area to have been inherently dangerous to fire or to have violated any safety regulations, and accordingly, the finding was unjustified.

### EVIDENCE OF POST-ACCIDENT CHANGES

Plaintiffs argue that the court erred in not allowing them to show post-accident changes in design of the transmission line. Questions on the subject were disallowed and following an explanation of counsel's respective viewpoints plaintiffs offered to prove that if McCulloch's superintendent had been permitted to testify in response to the question he would have said that his company had installed the separation facilities at the Gillette regulator station and that two drips had been installed in the line between the main line and Gillette. To substantiate the charge of error plaintiffs cite here, as they did in the trial court, Town of Douglas v. Nielsen, Wyo., 409 P. 2d 240, 243, for the principle that evidence of measures taken subsequently to safeguard an instrumentality which caused an injury although not admissible to prove

negligence may be received to show the practicality of safeguarding such an instrumentality. Scrutiny of the case discloses that we did not so decide but merely listed the argument of appellee to that effect, and the matter has not been passed upon by this court. There are persuasive arguments both for and against the allowance of the evidence under the exception. Courts that reject it often say evidence of a subsequently arranged safety device is irrelevant to the accident but probably the real reason is the contention that such acceptance may discourage persons from taking a safety measure. The matter is interestingly discussed in Annot., 170 A.L.R. 7, as supplemented by Annot., 64 A.L.R.2d 1296, with a good text statement in McCormick, Evidence § 252 (1954). We do not propose to decide the matter other than to say that plaintiffs have failed to substantiate their charge of error on this point.

### SUMMARY

As we analyze the cause, there have been numerous errors and misconceptions which have combined to prevent any proper determination of the charged liability. The court's holding that plaintiffs had not proved by a preponderance of the evidence that there was a breach of warranty, as well as its further statement that if there was it appeared to be insubstantial and not directly related to the damage sustained by plaintiffs, was incorrect and unjustified. Further, the finding that there was lack of proof that defendants were negligent is contrary to the evidence. Add to this the invalid findings regarding Murphy's purported contributory negligence as well as plaintiffs' rejected contention that contributory negligence can be no defense to breach of warranty and we have a climate which has prevented any real joining of the issues. The judgment cannot stand, but the cause is as yet undeveloped and not in a state which would properly support action of this court either making the defendants liable or exonerating them.

In our consideration of this matter and its disposition, we bear in mind the well established rule that findings of fact must be construed liberally and favorably to the judgment and that there is a presumption that the action of the trial court was right, Jassman v. Wulfjen, 71 Wyo. 261, 257 P.2d 334, 336; however, as we have pointed out during the discussion, the evidence in this case is uncontroverted and in that situation findings may be treated as legal conclusions, reversible by the appellate court, and where such evidence admits of only one conclusion, a contrary one may not stand. Wyoming Farm Bureau Mutual Insurance Company v. May, supra, 434 P.2d at 511; Hercules Powder Co. v. State Board of Equalization, 66 Wyo. 268, 208 P.2d 1096, 210 P.2d 824, 825. In Twing v. Schott, 80 Wyo. 100, 338 P.2d 839, 844, we said while "we are always reluctant to reverse a judgment unless it is clearly against the weight of the evidence, neither this nor any appellate court ought ever to hesitate about a reversal whenever it is apparent that the judgment is contrary to the law and contrary to the evidence." The interests of justice here require that this matter be returned for a new trial.

Reversed and remanded.

McINTYRE, Justice (dissenting).

The court's opinion points out that the district court held plaintiffs barred from recovery because of the contributory negligence of plaintiff Murphy.

There is no conflict in the evidence with respect to Murphy's negligence. Therefore, with a given set of facts, the question of whether Murphy's acts or omissions can be said to constitute negligence becomes one of law and not of fact. As such, the trial court's opinion in the matter is subject to review.

All of the facts bearing on this issue are clearly and fully set forth in the court's opinion. I am inclined to agree with the trial judge that Murphy's acts constituted negligence as a matter of law. I believe if Murphy had merely stopped the flow of fuel into the pilot line, by turning the control cock to its "off" position, he would have had success in suppressing the flame before it got out of control. Instead, he tried to blow the flame out, with fuel all the while feeding unrestrained into the pilot line. It was of course he who started the fuel into this line when he turned the control cock to its "pilot" position.

## ORDER

Appellees Petrolane-Wyoming Gas Service and McCulloch Gas Transmission Company having filed their petition for rehearing herein accompanied by a joint brief covering the points and authorities relied upon in support of said petition, and it appearing that the petition and arguments of appellees present no matter not considered and dealt with in the disposition heretofore made by this court:

It is ordered that said petition for rehearing be and the same is hereby denied.

McINTYRE, J., for the reasons stated in his dissent, would grant the rehearing.