**Kelly Jay CROMPTON and Clarence Don Crompton, Appellants (Defendants),**

**Warren M. Adamson and Louise Adamson, (Defendants),**

v.

**Robert L. BRUCE and Karol Bruce, Appellees (Plaintiffs).**

No. 83–61.

Supreme Court of Wyoming.

Sept. 23, 1983.

Rehearing Denied Oct. 24, 1983.

---

Charles D. Phillips, Evanston, for appellants.

Timothy O. Beppler of Vehar, Lehman, Beppler & Jacobson, P.C., Evanston, for appellees.

Before ROONEY, C.J., and THOMAS, ROSE, BROWN and CARDINE, JJ.

ROSE, Justice.

The trial court granted the plaintiffs relief: reformation of the disputed quitclaim deed and quiet title to the mineral estate. We will affirm.

## FACTS

The real estate transactions of concern here involve three families: Robert and Karol Bruce, husband and wife; Warren and Louise Adamson, husband and wife; and Clarence and Kelly Crompton, father and son. The Bruces, plaintiffs below and appellees here, are the sellers of the Wyoming property and buyers of the Idaho property. Appellants Adamsons are the Idaho sellers. Appellants Cromptons are the Wyoming buyers.

In the course of their search for suitable property to farm, the Bruces learned of the ranch the Adamsons had for sale in Idaho. They saw the property and desired to purchase it, hoping to sell their Wyoming property to raise funds. They entered into a contract for the sale of their Wyoming land to the Cromptons. The contract, as well as the associated warranty deed placed in escrow, reserved all oil, gas and minerals to the Bruces. In turn, as part consideration for the Idaho property, the Bruces assigned the installment land-sale contract to the Adamsons. The Bruces also executed a quitclaim deed which was placed in escrow in order to give the Adamsons security against the Cromptons' default. This deed did not reserve the minerals.

After the Adamsons became unhappy with the Bruces, Mrs. Adamson directed the bank holding the quitclaim deed executed by the Bruces to record the deed. Because the bank later thought the deed was missing, the Bruces were requested to execute and did execute an identical quitclaim deed. This was subsequently recorded.

In the meantime, the Adamsons were eager to have the Cromptons accelerate payment on the installment contract which the Bruces had assigned to the Adamsons. There had been a drought and the Adamsons' potato crop had failed. The Cromptons agreed to do this and sought financing from a bank. That bank promised to lend the necessary funds to the Cromptons, and, as part of the bank's internal procedures, searched title on the Wyoming property. The title examiner discovered the recorded quitclaim deed from the Bruces to the Ad-

amsons and informed the Cromptons, who became aware for the first time that the mineral rights were not reserved in the Bruce-Adamson deed. Subsequently, they asked the Adamsons to execute another quitclaim deed to them, which would contain the same provisions and description as the Bruce-Adamson quitclaim deed. The Adamsons complied, and the Cromptons recorded the Adamson-Crompton quitclaim deed. Thus, the Cromptons became the record owners of the mineral rights. The Cromptons did not discuss the status of the mineral rights with the Adamsons, nor did they pay to the Adamsons any more than was the Adamson's due under the original Crompton-Bruce contract which had been assigned to the Adamsons.

The Bruces became aware of this state of affairs for the first time when they were negotiating oil and gas leases after the Adamson-Crompton transaction was completed. Upon this discovery, the Bruces asked the Adamsons and the Cromptons to deed the minerals back to them. Both refused.

The instant suit followed. The Bruces sought reformation of the quitclaim deeds to conform to the parties' original understanding and quiet title to the minerals. The trial court found for the plaintiffs Bruces.

## THE ISSUES

The trial court found all the elements necessary for reformation and appellants Cromptons complain that there was not sufficient evidence to support its findings. Appellants also claim that their two defenses to reformation were improperly decided. They contend:

"It is inconceivable that a 32-year-old man, of obvious intelligence and good health, with substantial prior experience in real estate and other legal transactions, who had twice leased his own minerals for oil and gas and was aware of the value and potential and had been enlightened in quite a few areas of oil and gas, who just 47 days before he signed the first Quitclaim Deed had executed a contract and warranty deed to Cromptons

expressly reserving minerals and received a warranty deed the same day from his mother not reserving minerals, who at the Wyoming closing wanted it understood from the beginning that he was reserving the mineral rights and they were heavy on his mind at that time, who placed little or no value on the Wyoming minerals either at the time of the Wyoming closing or the Idaho closing and had no idea that oil was in the area at all, who was very interested in buying the Idaho property and wanted it pretty bad, who might have let the minerals go to Cromptons with the property if they had insisted, who never asked anyone whether the minerals were being reserved in the Idaho sale, who had to come down to $50,000 for the Wyoming contract before Adamsons were even willing to negotiate, who could not sell the Wyoming contract to anyone else *with* the minerals for as much as he sold it for to Adamsons, he says *without* the minerals, and who usually reads legal documents and tries to understand them before he signs them, could have mistakenly signed *two* Quitclaim Deeds not reserving the minerals because, he says, he had specifically instructed [realtor] Wills and [attorney] Beeks to follow the original contract and because he was told by Wills that the Quitclaim Deeds were for security for Adamsons in case Cromptons defaulted on the Wyoming contract, especially if, as is likely, by refusing to sign the first Quitclaim Deed he would run a severe and perhaps fatal risk of losing the Idaho farm he wanted so badly."

## APPELLATE REVIEW

The standards for appellate review are well established. As early as 1977, we said: "In matters of evidence on review, we apply the monotonously-repeated rule that an appellate court must assume evidence in favor of a successful party to be true, leave out of consideration the conflicting evidence of the unsuccessful party and give the evidence of the successful party every favorable inference which may be reasonably drawn from it. *Oede-*

*koven v. Oedekoven,* Wyo.1975, 538 P.2d 1292." *Douglas Reservoirs Water Users Association v. Cross,* Wyo., 569 P.2d 1280, 1283 (1977).

Also see *Foster Lumber Company, Inc. v. Hume,* Wyo., 645 P.2d 1176 (1982); *Robinson v. True Drilling Company,* Wyo., 641 P.2d 195 (1982); *Distad v. Cubin,* Wyo., 633 P.2d 167 (1981); *Western National Bank of Lovell v. Moncur,* Wyo., 624 P.2d 765 (1981).

██ Appellants claim that some of their testimony was virtually uncontradicted and should be credited as unimpeached evidence.

"While the trier of fact should be accorded considerable freedom in evaluating the testimony of witnesses, uncontradicted and unimpeached testimony cannot arbitrarily be disregarded. * * * *Beck v. Givens,* 1957, 77 Wyo. 176, 309 P.2d 715, reh. den., 77 Wyo. 176, 313 P.2d 977. * * *Ward v. Yoder,* Wyo.1960, 355 P.2d 371, reh. den., 357 P.2d 180. See also *Twing v. Schott,* 1959, 80 Wyo. 100, 338 P.2d 839." *Douglas Reservoirs Water Users Association v. Cross,* supra, 569 P.2d at 1284–1285.

The testimony of the Adamsons cannot be said to be uncontradicted and unimpeached because the Adamsons, in fact, impeached themselves. Questions of credibility are for the trial judge and it is the trial court's duty to weigh the evidence. His determination will not be upset by this court so long as it is rationally supported.

" * * * The trial court, not this court, is charged with the function of weighing conflicting testimony and evidence. The general rule is that so long as there is sufficient evidence upon which the trial court could rationally base its findings, such findings will not be adjusted in any way by the appellate court. *Palmeno v. Cashen,* Wyo., 627 P.2d 163 (1981); *Madrid v. Norton,* Wyo., 596 P.2d 1108 (1979)." *Thomasi v. Koch,* Wyo., 660 P.2d 806, 811 (1983).

The testimony of the Bruces, and witnesses Beeks and Wills, and the documents in the record, support the trial court's determina-

tion that the Adamsons' story was not credible. In the case at bar, appellants Adamsons denied the facts asserted by appellees Bruces and witnesses Beeks and Wills. The trial court found this testimony not worthy of belief:

> "The court carefully observed the demeanor and attitude of the Adamsons on the witness stand; * * * opportunistic and expedient * * * self-righteous * * * with little regard for any detriment their opponent might suffer. In short, the Court has looked the Adamsons in the eye and remains unconvinced that they are truthful or trustworthy; their testimony is not worthy of belief."

### ELEMENTS REQUIRED FOR REFORMATION

■ Reformation of a document requires three things: (1) a meeting of the minds—a mutual understanding between the parties—prior to the time a writing is entered into, (2) a written contract or agreement, (3) which does not conform to the understanding, by reason of mutual mistake. *Rainbow Oil Company v. Christmann,* Wyo., 656 P.2d 538, 544 (1982); *Pfister v. Brown,* Wyo., 498 P.2d 1243, 1244 (1972); *Russell v. Curran,* 66 Wyo. 173, 206 P.2d 1159, 1163 (1949); *State Bank of Wheatland v. Bagley Bros.,* 44 Wyo. 244, 11 P.2d 572, 589 (1932); *Grieve v. Grieve,* 15 Wyo. 358, 89 P. 569, 570 (1907); *Stoll v. Nagle,* 15 Wyo. 86, 86 P. 26, 28 (1906).

■ In a reformation suit, these three elements must be proved by clear and convincing evidence. *Pfister v. Brown,* supra, 498 P.2d at 1245. In *Thomasi v. Koch,* supra, 660 P.2d at 811–812, we said:

> " * * * This court previously has adopted language to this effect:
>> " ' * * * When the evidence is such that the mind readily reaches a satisfactory conclusion as to the existence or nonexistence of a fact in dispute, then the evidence is, of necessity, clear and satisfactory.' *Continental Sheep Co. v. Woodhouse,* 71 Wyo. 194, 202, 256 P.2d 97 (1953), quoting language found

in *Good Milking Mach. Co. v. Galloway,* 168 Iowa 550, 150 N.W. 710, 712 (1915). "We further have said that clear and convincing evidence is 'that kind of proof which would persuade a trier of fact that the truth of the contention is highly probable.' *MacGuire v. Harriscope Broadcasting Co.,* Wyo., 612 P.2d 830, 839 (1980)."

■ The trial court had before it clear and convincing evidence to support its finding that the original Bruce-Adamson understanding was that the mineral rights were to remain in the Bruces. Appellees Bruces testified that they never intended to transfer the mineral rights. The Bruces assigned to the Adamsons the Bruce-Crompton land-sale contract and this contract expressly reserved and excepted the minerals. Realtor Wills testified that he recalled having informed appellants Adamsons that the minerals were to remain in the Bruces.

No one disputes the existence of the subsequent written documents, all of which appear in the record.

It is clear on the face of the quitclaim deed that it did not reserve the mineral estate to the Bruces. Thus, the trial court had before it clear and convincing evidence that the quitclaim deed did not correspond to the parties' original agreement, in that it failed to except and reserve the oil, gas and minerals. The trial court found that this failure was due to the error of a scrivener. This evidence supports the trial court's finding that the failure to except and reserve the minerals was due to a mistaken and inadvertent omission.

Clearly then, appellees Bruces made out their prima facie case for reformation.

### DEFENSES

The appellants advance two defenses to the reformation: (1) the claimants' inexcusable negligence will prevent reformation; (2) a bona fide purchaser will be protected against reformation.

■ Appellants interpose the argument that "[i]t is negligence as a matter of law to not read a contract before signing." *Laird v. Laird,* Wyo., 597 P.2d 463, 467 (1979).

Apparently they would have this court decide that because Mr. Bruce admitted he did not read the second (replacement) quitclaim deed, identical in all respects save date to the first quitclaim deed, which he had read, he was negligent as a matter of law. This we decline to do. We agree that the trial court was correct in its determination that the mistake in the quitclaim deed was not due to negligence of the Bruces. The trial court had ample evidence before it to support its conclusion that the Bruces acted as reasonably prudent persons would in relying on the expertise of realtor Wills and attorney Beeks who drew the quitclaim deed.

 In addition, to defeat reformation the party seeking reformation must not only be negligent, he must be inexcusably negligent. We said in *State Bank of Wheatland v. Bagley Bros.,* supra, 11 P.2d at 589:

> "An examination of the cases generally establishes the rule that, where a party to a written instrument is inexcusably negligent in its execution, he is not entitled to have it reformed to relieve him from the consequences. 45 A.L.R. 701, note."

We will not upset the trial court's determination that the Bruces were not inexcusably negligent.

Appellants Cromptons would also have this court decide that they are bona fide purchasers of the mineral rights and reverse the judgment reforming the quitclaim deed. The elements required to establish a bona fide purchaser so as to defeat reformation are: (1) a purchaser in good faith, (2) for valuable consideration, not by gift, (3) with no actual, constructive, or inquiry notice, (4) who would be prejudiced by reformation. *Soppe v. Breed,* Wyo., 504 P.2d 1077, 1088 (1973); *North American Uranium, Inc. v. Johnston,* 77 Wyo. 332, 316 P.2d 325, 328–329 (1957); *York v. James,* 60 Wyo. 222, 148 P.2d 596, 598 (1944).

The trial court had ample evidence before it to find that the Cromptons were not bona fide purchasers. None of the factors were met. The trial court found that

the Cromptons did not exercise good faith toward either the Adamsons or the Bruces. They did not pay valuable consideration for the mineral rights, but became the record owners by a windfall. The Cromptons had actual notice of the defect in the quitclaim deed because they were party to the contract with the Bruces; they had constructive notice because the assignment of that contract to the Adamsons was recorded; they had inquiry notice when they learned that the quitclaim on record to the Adamsons did not reserve the minerals. The Cromptons certainly cannot be prejudiced by giving up the windfall this series of events produced for them. Appellants simply have not made out their defense of bona fide purchaser.

Affirmed.