Rex A. BRITTON and Veronica K. Britton, Appellants (Plaintiffs),

v.

BILL ANSELMI PONTIAC–BUICK–GMC, INC., Appellee (Defendant).

No. 89–100.

Supreme Court of Wyoming.

Jan. 26, 1990.

James K. Lubing of Goody & Lubing, Jackson, for appellants.

Robert J. Pickett of Pickett & McKinney, Rock Springs, for appellee.

Before CARDINE, C.J., and THOMAS, URBIGKIT, MACY and GOLDEN, JJ.

URBIGKIT, Justice.

This is a lemon car lawsuit where, following numerous unsuccessful attempts to have their 1983 Buick Regal repaired, appellants Rex A. and Veronica K. Britton (Britton) brought suit against the seller of the vehicle, Bill Anselmi Pontiac–Buick–GMC, Inc. (BAI), and the manufacturer, General Motors Corporation (GM). Their complaint sought recovery of the $15,-184.84 purchase price, incurred costs and attorney fees by allegations of fraud, breach of both express and implied warranties, and failure to comply with both the federal Magnuson–Moss Warranty Act, 15 U.S.C. §§ 2301–2312 and Wyoming's "Lemon Law", W.S. 40–17–101 (1989 Cum. Supp.). GM settled with Britton and the case proceeded to a bench trial against BAI. The district court allowed recovery for the dealership's breach of warranty, determined the Brittons had failed to establish their fraud claim or their claims under either of the two statutory causes of action, and only awarded damages of $1,500. The Brittons question contended district court errors:

1) * * * in ruling that fraud was not proven at trial when:

a) ample evidence of fraud was produced at trial, and

b) Appellant Veronica Britton was prohibited from testifying as to representations made to her by an agent of Appellee because of erroneous application of the hearsay doctrine?

2) * * * in not applying the Wyoming lemon law when the Appellee represented the car as a new car at the time of sale, and the car was covered under a new car warranty?

3) * * * in not applying the Magnuson–Moss Warranty Act which applies to used as well as new cars?

We reverse and remand.

FACTUAL BACKGROUND

On December 4, 1984, the Brittons visited the Buick–Pontiac–GMC dealership in Rock Springs, Wyoming to purchase a car. Although initially intending to buy a new vehicle, they had become curious about BAI's radio advertisements trumpeting the arrival of a number of "Brass Hat" specials. Dick Boling, company salesman and an acquaintance of the Brittons, informed them the advertisements referred to certain low-mileage vehicles which had never been privately titled and had only been used as company cars by GM executives. Because such cars, with the availability of new car financing and their 12

months/12,000 miles new car warranty, had been described as comparable to new vehicles, the Brittons permitted Boling to show them one of the "Brass Hat" specials, a 1983 Buick Regal. When they inquired about a dealer's identification sticker on the rear of the car, Boling explained that the vehicle had been used solely to transport GM executives to and from the Jackson, Wyoming airport, but that GM had permitted Teton Motors, Inc., a local Jackson dealership, to place the sticker on the car for advertising purposes. The Brittons bought the car and purchased additional warranty protection which extended the basic new car warranty to a term of 48 months/48,000 miles.

The Brittons immediately experienced problems with the vehicle. Between the purchase date and June 1985, they repeatedly attempted to have BAI repair the following items: a malfunctioning tape deck, an "adjustable" heater that would deliver only cold air or air heated to eighty-five degrees, windows that would not fully close, a defective alternator, a non-functioning gas gauge, a leaking sun roof, broken electric seats, paint that washed off when the car was hosed down, a malfunctioning turbocharger, and a leaking and slipping transmission. The Brittons claimed that, during those six months, they had the car towed a number of times, took the car back for repair fifteen times, and lost the use of the vehicle due to repairs for forty-five days. Notwithstanding the time and effort presumably put into those repair efforts, the dealership managed to fix only the alternator, and that only after three tries. Compounding the frustration and inconvenience of these unsuccessful attempts to repair the car, one of the dealership's mechanics, harboring an unrelated personal grudge against Rex Britton, threatened to make the vehicle the instrument of his vengeance.[1] The Brittons, accordingly, engaged the services of an attorney.

By this time, the parties' business relationship had become nearly as irreparable as the "Brass Hat" special. The Brittons resisted suggestions of further attempts at repair. BAI's alternative offer to exchange the 1983 Buick Regal for another vehicle, because it appeared limited to vehicles of lesser value than the Buick and appeared to require further expenditures by the Brittons to obtain a car of comparable value, met with similar resistance. Negotiations were further discouraged by the Brittons' discovery that their "new" vehicle had actually been owned previously by a Jackson man who had prevailed in a suit against Teton Motors, Inc. and GM after the dealership proved unable to correct a myriad of problems with the car. Many of the defects plaguing the prior owner were identical to the problems encountered by the Brittons.[2] Meanwhile, the "Brass Hat"

1. Britton was a Wyoming Highway Patrolman assigned to the Rock Springs division and had previously arrested the mechanic "for numerous traffic violations." On a trip to the garage for repair, Britton testified:

[T]his gentleman [the BAI mechanic] came up to me and says Officer Britton, remember me. I said yes, I do. And he said I just want you to remember one thing, the next time you bring your car in here, I'm going to be the one that works on it, and I just want you to remember what goes around comes around.
Q. You didn't take your car in there after that?
A. No, sir. I was afraid to.

In fairness, testimony was also given on behalf of appellee that this "technician" was fired when the employer confirmed the threat had been made to the customer.

2. The condition of the vehicle in first ownership by Richard and Linda Martin in Jackson before title was transferred to the unsuspecting buyers in Rock Springs is vividly described by the Teton County District Judge in an opinion letter in awarding judgment of $20,964.41 (including attorney fees and nominal punitive damages) to the Martins for their problems for possession in the period between May 26, 1983 and when the keys were handed back to the vendor on September 24, 1984. The district court, in the opinion letter, after relating the initial history of the purchase by the Martins, stated:

In any event, the 1983 Buick Regal in question (Regal) arrived 2 months 15 days after it was ordered. It arrived without the electric seat which had been ordered, but which had been placed on the new car sticker on the window of the Regal and had been paid for by the consumer and by Teton Motors. In fact, Tom Shear, the salesman, stated it was the first time in his experience as a car dealer that the manufacturer charged for an item which had not come with the car and been placed on the sticker. That, of course, was only one of

special continued to tarnish in various garages and repair shops. On April 17, 1986, the Brittons filed the present lawsuit.

## PROOF OF FRAUD

At trial, the Brittons attempted to introduce both direct and circumstantial evidence that the salesman, Boling, had misrepresented the history of the purchased vehicle. The direct evidence consisted largely of the uncontradicted and unimpeached testimony by Rex Britton, and Veronica Britton to the extent as purchasing owner, she was permitted to testify as to statements made by Boling. The circumstantial evidence included newspaper advertisements, published a few days after the sale, which corroborated Boling's defi-

nition of a "Brass Hat" special and which confirmed that BAI was selling the purchased vehicle under such a guise. Additionally, the Brittons introduced evidence of the dealership's guilty plea to criminal charges that those advertisements, in describing the listed vehicles as "Brass Hat" specials, were knowingly false and misleading. The district court concluded that such evidence was insufficient to establish the Brittons' case for fraudulent misrepresentation.[3]

The only rationale given for that conclusion appears in the district court's decision letter of February 13, 1989 which stated:

> Several of the exhibits go to the wrongdoing of Bill Anselmi, Inc. in the

---

the problems as the Court finds this car was a "lemon" from the outset.

> Not only was the electric seat not installed, but there was a dent in the hood, there was bad painting on the side of the car and the overspray had been sprayed on the chrome and the windows, the windows did not seat, there were scratches on the paint, the passenger window squeaked and there was a leak in the transmission. This was not the only trouble because later, after the car had been returned to Teton Motors by the Martins, it was found that there was also an engine oil leak in the Regal.

The district court then related the history of the period of total frustration from purchase to redelivery of the keys, including attempted repair and continued problems. According to the district court:

> On September 24th they returned to Jackson but, when coming up Parley's Canyon from Salt Lake City, the car began to smoke and transmission fluid was again leaking. They again bought transmission fluid at the top of Parley's Canyon just east of Salt Lake City and limped back to Jackson. They called Earl Auge on September 26th; Mr. Martin explained they had had it and that they had "had all the fun they could have with this car." On that date, Mr. Martin took the car to Teton Motors where he was to visit with Mr. Auge, but it appears that Mr. Auge was busy, so Mr. Martin went to the rear of Teton Motors, left the car outside and waited for Mr. Auge. After waiting what he felt a reasonable amount of time, Mr. Auge did not appear, he told the service manager he was turning the car back and handed they keys over. The plaintiffs have not had possession of the Regal since that date.

**3.** Initially, the Brittons were called to inquire at that automobile sales agency by a radio advertisement for the "Brass Hat" special. The signif-

icance of the newspaper advertisement by contention of the Brittons as published three days after purchase was that it was demonstrative proof in print confirming the text of the identical statement by the salesman which had been the basis of their initial purchase. They admitted they did not rely on the newspaper advertisement, but that information was identical to the earlier radio advertisement and the sales pitch of the BAI employee at demonstration and purchase discussions. The asserted defense of appellee that the vehicle was only sold as a normal buy-back vehicle was impacted by both the newspaper advertisement and guilty plea which inferred to the contrary.

Boling did not testify at trial, having both left the dealership employ and moved from the community. The record reflects efforts of the Brittons to find him in the Gillette, Wyoming area. Whether his former employer knew anything about his whereabouts by trial time is undisclosed in this record. Consequently, tie-in relations between what he said or did is also undisclosed as, for example, who handled directions for typing on the differentiated sales and warranty instruments and who got the car title for the buyer from the Sweetwater County Clerk in Green River, Wyoming. *See* n. 5, n. 7 and n. 12, *infra*.

It is noted that between September 24, 1984 and December 4, 1984, the vehicle reappeared in Rock Springs on the BAI sales floor. As detailed in n. 5, *infra*, title had not been transferred from the Martins to anyone prior to the delivery in Rock Springs. A sticker was found on the back of the car in large letters reflecting "Teton Motors, Inc., Jackson Hole, Wyoming." This advertising symbol had been explained to the Brittons by salesman statement that the car had been used between Jackson and the airport in that community and that, for advertising purposes, the local dealer was given the right to install the sticker.

advertising of the car as a *Brass Hat Special*. The company was prosecuted and convicted for the fraudulent advertising. The testimony, however, was that the Plaintiffs did not go to the dealer for a Brass Hat Special but for a new car. The actual ad in evidence which led to the conviction ran in the newspaper three days after the Brittons purchased the car. The testimony also indicated that Bill Anselmi, Inc. advertised the car the same way G.M.C. advertised it to him.[4]

(Emphasis in original.) This statement suggests the district court conceived the Brittons' case for fraud to be based solely upon misrepresentations contained in the newspaper advertisements. Insofar as that characterization of the case is correct, the district court perhaps concluded: (1) the advertisements could not have induced the sale since they were not published until after the sale; (2) the advertisements could not have induced the Brittons to seek a

"Brass Hat" special since they admitted that, despite the advertisements, they had gone to BAI to buy a new car; and (3) the car seller was not culpable because, having itself relied on the representations of GM, it made no knowing misrepresentations to the Brittons. We do not believe, however, that such a characterization of the Brittons' fraud case comports with the record. Their case rested, not on misrepresentations contained in the newspaper advertisements, but rather on the false statements of Boling. Because evidence regarding those statements was crucial to the Brittons' case, we turn our attention to the propriety of excluding much of that evidence.[5]

██ When Veronica Britton was questioned about Boling's pre-sale representations, appellee entered a hearsay objection. The district court clearly erred in sustaining that objection over the Brittons' argument that statements made in Boling's ca-

---

4. We do not understand where this conclusion was derived since the record reveals without dispute that the radio advertisement for the "Brass Hat" special was an inducement for their initial visit to, and inquiry from the seller about the purchase of that kind of vehicle.

5. The undisputed testimony of Britton denies suggestion that the status of this car as a used Wyoming vehicle was unknown to BAI personnel. Britton explained that, in bolting down a child restraint seat by removal of the back seat, he discovered a "name badge that said Dick Martin on it." He then described:

Q. Did you ever find out who this Dick Martin was?
A. I found out later on that Mr. Martin was the original purchasing owner.
Q. How did you find that out?
A. In June of '85, we had contacted our private attorney, Mr. Leonard Kaumo, to look into the possibility of a Lemon Law suit against Mr. Anselmi. He told me to go over and secure a copy of the title, and I went over to the Green River Courthouse, downstairs in the building here, and talked to the auto licensing people, the Clerk of Court, asked her for a copy of my title. She handed me a copy of it and it said used on the title. That's the first time I'd ever seen the title. I asked her to see the application for title, she went and got it, and on the back of it, it stated that Mr. Martin had been the owner of the vehicle previous to me.
Q. Did you do any follow-up to find out anymore about the history of that car?

A. Yes, I did. I called Mr. Martin in Jackson and he told me that the car had been involved in a lengthy lawsuit in Teton County and that he eventually went to court, the Judge found in favor of the Plaintiff, Mr. Martin, and the car was repurchased by General Motors or given back to General Motors. With this undisputed evidence, we have an established record that when BAI received the car, it was accompanied by a title issued to a Wyoming resident which, in the nature of things, would have been assigned in blank by the Martins when they settled with GM as the result of the Teton County litigation. The title the seller received for transfer of ownership to the Brittons would have been issued in the name of the Jackson resident and the vehicle itself carried the logo for Teton Motors, Inc., Jackson Hole, Wyoming. If GM had secured a re-issued title upon settlement with the Martins, its name rather than the Martins' would have appeared on the application of transfer of title obtained by BAI for Britton in Sweetwater County. It is realistic to recognize that GM may have also committed fraud on the dealership by delivery of a vehicle without explaining the tale of woe when first sold in the adjoining community. At the same time, appellee was provided information that the vehicle had been issued in the name of an individual. With a mileage of only 6,700, an expert in the automobile sales business could conclude that something was, at best, strange in "western Wyoming."

pacity as BAI's agent were not hearsay. W.R.E. 801(d)(2)(D) states:

(d) *Statements which are not hearsay.* —A statement is not hearsay if:

\*   \*   \*   \*   \*   \*

(2) Admission by Party–Opponent.— The statement is offered against a party and is \* \* \* (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship.

Boling's statements as a car salesman, admittedly employed by the dealership at the time he sold the 1983 Buick Regal to the Brittons, were obviously offered against his employer. Any such statements made to Veronica Britton, a prospective customer, concerning the history of that vehicle were unquestionably "matter[s] within the scope of his agency or employment." W.R.E. 801(d)(2)(D). Thus, those statements were not hearsay and were erroneously excluded. *See Kobielusz v. Wilson,* 701 P.2d 559, 562 (Wyo.1985). This was fundamental evidence of Brittons' case, and particularly so since, by the buyer's copy of the sales instrument, she was the only buyer. *See* n. 7 *infra.*

■ BAI, however, asserts on appeal that, because Rex Britton testified concerning Boling's statements, any error in excluding Veronica Britton's testimony must be harmless. We cannot agree. While the substance of her testimony might be apparent from the record, we cannot with any assurance assume that its quality or scope would have been identical to that given by her husband. Had Veronica Britton's testimony proved more convincing than her husband's, or had it been strongly corroborative of his testimony, the district court might not have so easily limited its examination of BAI's putative fraud to a consideration of the misleading newspaper advertisements. Although the district court appears to have given little weight to Rex Britton's testimony regarding the seller's

pre-sale representations, focusing instead solely on the proof of its after-the-fact advertisements, we are unable to conclude that it would do so again in the face of additional testimony for it is clear the Brittons established a prima facie case of fraudulent misrepresentation.[6]

■ To make such a case, the Brittons needed to introduce evidence that the BAI salesman knowingly made a false representation of a material fact with the intent of inducing them to buy the car, and that they were induced to make the purchase, to their detriment, by their reasonable reliance upon his statements. *See Willmschen v. Meeker,* 750 P.2d 669, 672 (Wyo. 1988); *Garner v. Hickman,* 709 P.2d 407, 410 (Wyo.1985); and *Duffy v. Brown,* 708 P.2d 433, 437 (Wyo.1985). Evidence of any active conduct or words by Boling which tended to produce an erroneous impression might sufficiently satisfy that burden if those half truths had the effect of lies. Although BAI and its salesman were under no legal duty to speak on the matter of the 1983 Buick Regal's ownership history, once they chose to speak they were obligated to fully and fairly disclose the truth of the matter. *Meeker v. Lanham,* 604 P.2d 556, 558 (Wyo.1979); *Simpson v. Western National Bank of Casper,* 497 P.2d 878, 880 (Wyo.1972); *Twing v. Schott,* 80 Wyo. 100, 338 P.2d 839, 841 (1959).

■ The Brittons even met their burden without the challenged testimony of Veronica Britton. Rex Britton testified that Boling completely fabricated an account of the 1983 Buick Regal's presence in Jackson, thereby embellishing upon the false claim that it had only seen use as a GM company car. The company owner testified that no one in his organization had any such detailed knowledge of the vehicle's history. It is difficult to conceive of a situation in which the history of a vehicle would not be material to a prospective purchaser. Since the Brittons had gone to the

---

6. The guilty plea to the fraudulent newspaper advertisements, which were similar to the radio advertisements and the same as the salesman's spiel in a transactional evaluation, provides probative strength to evidence addressing contentions of fraud. This record provides not the semblance of an indication that the Brittons were told that this vehicle was a second-owner, repossession or lemon reject from Jackson, Wyoming.

automobile sales company with the intent of purchasing a new vehicle, Boling's fabrication appears to have served its obvious purpose of diverting the Brittons' plans and inducing them to purchase the used 1983 Buick Regal.[7]

We recognize at bench trial it is the provence of the district court to determine whether fraud has been proven by clear and convincing evidence. *Albrecht v. Zwaanshoek Holding En Financiering, B.V.,* 762 P.2d 1174, 1177 (Wyo.1988); *Duffy,* 708 P.2d at 437; *Meyer v. Ludvik,* 680 P.2d 459, 464–65 (Wyo.1984). However, it has long been the position of this court that testimony favoring a party which is both uncontradicted and unimpeached cannot be wholly ignored during the district court's deliberations. *Crompton v. Bruce,* 669 P.2d 930, 933 (Wyo.1983); *Creek v. Town of Hulett,* 657 P.2d 353, 357 (Wyo.1983); *Twing,* 338 P.2d at 841. Thus, we will not ordinarily disturb its decision regarding the existence of fraud unless it is unsupported by the evidence or is against the great weight of the evidence on record. *True Oil Co. v. Sinclair Oil Corp.,* 771 P.2d 781, 793 (Wyo.1989); *Walter v. Moore,* 700 P.2d 1219, 1222 (Wyo.1985); *Meeker,* 604 P.2d at 558. Because the Brittons' prima facie case of fraud is both unimpeached and un-

contradicted, we assume that the district court gave due consideration to the evidence of Boling's statements, despite its apparent concentration on BAI's post-sale misrepresentations. We cannot intrude on what may have been merely the district court's assessment of a witness' credibility. However, we must allow for the possibility that, with the addition of Veronica Britton's testimony, the district court might find the weight of evidence shifted in the Brittons' favor. We, therefore, decline BAI's invitation to hold the erroneous exclusion on Veronica Britton's testimony harmless, and accordingly remand for further consideration of the Brittons' fraud claim.

## APPLICABILITY OF THE MAGNUSON-MOSS WARRANTY ACT

■ We also remand the Brittons' claim for relief under the federal Magnuson-Moss Warranty Act for reconsideration by the district court. The Act provides, at 15 U.S.C. § 2310(d) (emphasis added):

(1) Subject to subsections (a)(3) and (e), a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this title * * *, or *under a written warranty, implied warranty, or service*

---

7. Careful examination of the sales documents reveal what is sometimes called double layering sales papers. *See Wales v. Roll,* 769 P.2d 899, 904 (Wyo.1989), Urbigkit, J., concurring in part and dissenting in part. The printed form used for the retail sales contract was the General Motors Acceptance Corporation Z–109WY printed form which obviously comes in a set of quadruplicate instruments as a carbonized combination. At issue in the case was controversy about the Brittons' knowledge that the car was used. Rex Britton testified, as did Veronica Britton, that they had signed one copy and then were handed another copy which they signed without examination, since each was required to be signed in the original. Present exhibits reveal that these two forms, *even though part of a carbonized set, were not the same.* Examination of the lower portion of the form (even from the xerox copies presented in evidence) reveals that a one typing process was used for most of the insertions on the forms. The two forms were, however, typed separately for the information at the top left where the names were different for the purchaser with Rex Britton included in one and not on the other and the first form which was signed as buyers' copy

stating nothing in the space for designation of new or used and the car model was stated to be a Buick Englewood, while the second form, which was the dealer's copy, was typed in altered form to state in the space for new or used, "used," and a different make and model "Buick Regal." When the top form, as a part of a carbonized set, comes out typed differently from succeeding instruments in the same set, it is sometimes described as double layering sales documents.

After purchase on December 4, 1984, with anticipated acquisition of a new car warranty "just like the newspaper advertisement said and the salesman promised," the customer was charged a sales amount of $350 for "an extended warranty." The Brittons first learned about the unavailability of the promised warranty by a letter from BAI dated May 15, 1985 which stated:

Due to the age of your vehicle it cannot be covered as a new car under the Automobile ·Mechanical Repair Agreement service contract.

The cost of the plan $350.00, has been credited to your account with GMAC.

I apologize for any inconvenience.

*contract*, may bring suit for damages and other legal and equitable relief—
(A) in any court of competent jurisdiction in any State * * *.[8]

The Brittons were clearly "consumers" under the Act, and BAI was just as clearly a "supplier."[9] Furthermore, the district court expressly found the Brittons entitled to relief under a breach of warranty theory. Although the district court's decision letter and the remainder of the record do little to clarify whether the promise the district court found breached would best be characterized under the Act as a written warranty, an implied warranty, or a service contract, we cannot help but to conclude

that it must fall under one or a combination of these headings and particularly so because an extra $350 was paid for acquisition of the warranty as a result of the sales negotiations.[10] We therefore hold the Brittons have established their cause of action under the Magnuson–Moss Warranty Act, and remand for a determination of their entitlement to the Act's expanded remedies.[11]

## APPLICABILITY OF WYOMING'S "LEMON LAW"

■ In its decision letter, the district court makes the following comments regarding the Brittons' warranty protection:

**8.** Subsection (e) deals with the availability of class actions under 15 U.S.C. § 2310 and is inapplicable to the present case. Subsection (a)(3) permits warrantors to establish informal dispute settlement mechanisms, conforming to the Federal Trade Commission rules, and to require consumers to utilize those mechanisms as a prerequisite to suit. Nothing in the record suggests that subsection (a)(3) would prevent the maintenance of the Brittons' suit. Additionally, research suggests GM discontinued the use of such mechanisms prior to the filing of this suit. *See* 54 Fed.Reg. 21,070 n. 2 (1989).

**9.** 15 U.S.C. § 2301 defines those terms in the following manner:
(3) The term "consumer" means a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or written warranty (or service contract) applicable to the product, and any other person who is entitled by the terms of such warranty (or service contract) or under applicable State law to enforce against the warrantor (or service contractor) the obligations of the warranty (or service contract).
(4) The term "supplier" means any person engaged in the business of making a consumer product directly or indirectly available to consumers.

**10.** *Written warranties, implied warranties and service contracts are distinguished by* 15 U.S.C. § 2301 *in this way:*
(6) The term "written warranty" means—
(A) any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or
(B) any undertaking in writing in connection with the sale by a supplier of a consumer product to refund, repair, replace, or take

other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking,
which written affirmation, promise, or undertaking becomes part of the basis of the bargain between a supplier and a buyer for purposes other than resale of such product.
(7) The term "implied warranty" means an implied warranty arising under State law (as modified by sections 108 and 104(a)) [15 U.S.C. §§ 2308 and 2304(a) ] in connection with the sale by a supplier of a consumer product.
(8) The term "service contract" means a contract in writing to perform, over a fixed period of time or for a specified duration, services relating to the maintenance or repair (or both) of a consumer product.

**11.** In addition to the traditional damages remedy afforded for warranty breach under W.S. 34–21–293 and 34–21–294, 15 U.S.C. § 2310(d) permits, in cases concerning the breach of written or implied warranties or service contracts, various forms of equitable relief and the award of costs and attorney's fees. We note at this point in our discussion that this appeal aims primarily to enlarge the remedies available to the Brittons. Should they ultimately prevail on their fraud claim, a variety of equitable remedies, *including rescission and return of a portion* of the purchase price, would conceivably become available under W.S. 34–21–299.1 and this court's decision in *Meyer*, 680 P.2d 459. Similarly, replacement of the automobile or a return of the purchase price would become available should the Brittons establish their right to relief under Wyoming's "Lemon Law", discussed below. While the Magnuson–Moss Warranty Act, to some extent, duplicates the remedies afforded by alternative theories of recovery, its real value lies in its provision of costs and fees with fewer of the restrictions imposed by Wyoming's "Lemon Law", the only other source of such relief.

Plaintiffs are entitled to recover under a cause of action for Breach of Warranty.
* * *

    \*      \*      \*      \*      \*      \*

* * * The warranty was not in effect when Mr. Britton "spun a rod" in December, 1987, because mileage on the vehicle exceeded 51,558 which was the limit.

While this statement fails to eliminate the possibility that the district court may also have considered the Brittons entitled to relief under an implied warranty, and while the record is unclear as to whether the document referenced in that statement would more aptly be characterized a written warranty or a service contract under the Magnuson–Moss Warranty Act, there is only one document in the record which the district court could have had in mind. That is the instrument which allegedly extended the Brittons' 12 months/12,000 miles warranty protection to a term of 48 months/48,000 miles, and which was variously described as an "extended warranty" or a "repair agreement."

Regardless of the label placed on this document, the district court identified only one characteristic of the agreement which excluded the Brittons from the protection of Wyoming's "Lemon Law," W.S. 40–17–101 (1989 Cum.Supp.). The district court's opinion letter states:

> As mentioned in the Summary Judgment Opinion letter, this car was not new as it had 6,558 miles on it when purchased by the Brittons. (Even the ad reflected as much.) The 1983 car was purchased in December, 1984 when new cars were 1985 models. And, although

there was some conflict in testimony, the contract states "used".[12]    Therefore, Wyoming's Lemon Law does not apply

That is, the district court found Wyoming's "Lemon Law" inapplicable because the warranted vehicle was not "new", as that word is usually and commonly employed.

Indeed, portions of the definitional and remedial subsections of the statute suggest such a conclusion. W.S. 40–17–101(a)(iv), (b) and (c) (emphasis added) state:

> (iv) "Manufacturers' express warranty or warranty" means the written warranty, so labeled, of the manufacturer of *a new motor vehicle*, including any terms or conditions precedent to the enforcement of obligations under warranty.

> (b) If *a new motor vehicle* does not conform to all applicable express warranties and the consumer reports the nonconformity to the manufacturer, its agent or its authorized dealer within one (1) year following the original delivery of the motor vehicle to the consumer, the manufacturer, its agent or authorized dealer shall make repairs necessary to conform the vehicle to the express warranties. The necessary repairs shall be made even if the one (1) year period has expired.

> (c) If the manufacturer, its agents or authorized dealers are unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any defect or condition which substantially impairs the use and fair market value of the motor vehicle to the

---

**12.** The finding failed to reflect that the copy of the sales documents given the buyer did not reflect that the vehicle was used. It was only the second dealer's copy which contained that notation. *See* n. 7, *supra*.

From the documents furnished, we do not know whether this vehicle was a used 1983 Buick Regal or a new Buick Englewood. *Exhibit 5 (owner's copy), which was the warranty-repair agreement, stated that the vehicle was a new 1983 Englewood,* one copy of the sales agreement conditional sales document provided that it was an Englewood without designation, and another that it was a Regal as used. A check of VIN numbers throughout the documents and in comparison to the text of the

guilty plea for false advertising, which then related to work orders, would define the vehicle as a Regal, 1983 model. Count I of the Information, Case No. Cr–8810–0048, Sweetwater County, stated:

> and knowingly cause an advertisement to be disseminated on December 7, 1984 in the Rock Springs Rocket Miner for a 1983 Buick Regal, VIN 1G4AK4780DH951867 which stated that said vehicle was a "Brass Hat" special or a General Motors car driven by General Motors executives with the intent to promote the sale of such property when it knew that said advertisement was false and misleading; Contrary to W.S. Section 6–3–611—FALSE ADVERTISING.

consumer after a reasonable number of attempts, the manufacturer shall:

(i) Replace the motor vehicle with a new or comparable motor vehicle of the same type and similarly equipped; or

(ii) Accept return of the motor vehicle and refund to the consumer and any lienholder as their interest may appear the full purchase price including all collateral charges less a reasonable allowance for consumer's use.

Because the term "new vehicle" is undefined under the statute, one would normally be justified in adopting the position of the district court that such a vehicle is one which has had no prior owner and one which has seen only the negligible mileage associated with test driving and transport between assembly line to showroom. Such is not the case, however.

W.S. 40–17–101(a)(i)(A), (B) and (C) define a "consumer" as any person:

(A) Who purchases a motor vehicle, other than for purposes [purpose] of resale, to which an express warranty applies; or

(B) To whom a motor vehicle is transferred during the term of an express warranty applicable to the motor vehicle; or

(C) Entitled by the terms of an express warranty applicable to motor vehicle to enforce it.

It is clear from subsections (B) and (C) of this definition that a consumer need not be the first owner of a "new vehicle" to be entitled to the protection of the statute, so long as either the manufacturer gave the first owner of that vehicle an "express warranty" which is still in effect at the time of transfer to the consumer or the consumer has been given such a warranty by the manufacturer. The crucial fact is not that the vehicle has been previously owned, nor that the vehicle has been driven a substantial number of miles, but rather that the transfer of the vehicle to the consumer occurs during the term of a prior warranty or is accompanied by a new warranty. To read the definition otherwise would be to ignore the plain language of subsections (B) and (C) and to render them

superfluous. This definition, however, clearly conflicts with the district court's criteria for a "new vehicle," lack of prior ownership and substantial mileage, thereby rendering the term "new vehicle" ambiguous.

This court will abide by the plain language of a statute so long as the meaning of the statute is, by such a reading, clear and unambiguous. When ambiguity arises, though, we resort to well-settled principles of statutory construction, reading all portions of the statute in pari materia under the assumption that the legislature intended no part of its enactment to be inoperative or superfluous. We construe every word, every clause and every sentence so as to avoid rendering the legislature's actions futile or absurd. *Story v. State*, 755 P.2d 228, 231 (Wyo.1988); *Deloges v. State ex rel. Wyoming Worker's Compensation Division*, 750 P.2d 1329, 1331 (Wyo.1988); *Hamlin v. Transcon Lines*, 701 P.2d 1139, 1142 (Wyo.1985).

The legislature expressed, by definition, an intent to extend the benefits of the "Lemon Law" to three classes of "consumers": (1) those who were the first purchasers of a "new vehicle" under its "manufacturer's express warranty"; (2) those who became the subsequent owner of a "new vehicle" prior to the lapse of the "manufacturer's express warranty" given to the first purchaser of the vehicle; and (3) those subsequent owners of a "new vehicle" who otherwise obtained the protection of a "manufacturer's express warranty." The common feature of each of these consumer classes is not that they were the first purchasers of a current model year vehicle with a blank odometer. Thus, we cannot use that feature to define a "new vehicle" without voiding the benefit the legislature intended to bestow. The circumstance that binds all these consumers is that the manufacturer chose to make an express "new vehicle" warranty applicable to their vehicles. Only by including all such vehicles within the definition of the term "new vehicle" can the full breadth of legislative protection find effect. Only by such means can the ambiguities of this statute be re-

solved to render all parts of the statute operative.

In the present case, the Brittons' 1983 Buick Regal was at least initially provided a "full new car warranty." Such being the case, it was a "new vehicle" for purposes of the Lemon Law and the Brittons were entitled to have the vendor remedy its defects according to the statutory standard. Since, as the district court found, the Brittons were damaged by BAI's failure to conform the vehicle to what the district court characterized as an express warranty, the Brittons were entitled by W.S. 40–17–101(j) to "bring a civil action to enforce this section and * * * recover reasonable attorney's fees from the manufacturer who issued the express warranty." Accordingly, they could seek any of the remedies of W.S. 40–17–101(b) and (c) set out above. The district court erred in its determination that Wyoming's "Lemon Law" was inapplicable under the facts of this case.

We reverse the decision of the district court which denied the Brittons relief under their claim of fraudulent misrepresentation, the Magnuson–Moss Warranty Act and Wyoming's "Lemon Law," and remand for retrial.

CARDINE, Chief Justice, concurring in part and dissenting in part.

I concur with the result reached by the majority in this case and, for the most part, concur with the reasoning by which it arrived at that result. However, because the majority has deviated from sound and customary principles of statutory construction in its treatment of Wyoming's "Lemon Law," I am compelled to take issue with that portion of the court's opinion.

W.S. 40–17–101(a)(i) (June 1989 Cum. Supp.) provides:

" 'Consumer' means any person:

"(A) Who purchases a motor vehicle, other than for purposes [purpose] of resale, to which an express warranty applies; or

"(B) To whom a motor vehicle is transferred during the term of an express warranty applicable to the motor vehicle; or

"(C) Entitled by the terms of an express warranty applicable to a motor vehicle to enforce it."

While I agree with the court's assertion that subsections (A), (B) and (C) of this provision clearly extend statutory protections to three distinct classes of consumers, I depart from its reasoning in distinguishing those classes.

The court's opinion assumes that all consumers protected by this statute share two characteristics: they are all "purchasers" of vehicles, and they are all entitled to enforce an express warranty. The court reasons that, if the statute's application is confined to new vehicles, little remains to differentiate between the three consumer classes. It concludes that subsections (A), (B) and (C) are redundant under such a reading, thereby rendering the statute ambiguous. Accordingly, the court abandons the plain and usual meaning of the term "new vehicle" and, instead, defines it as a vehicle carrying a "new vehicle warranty." By such means, the majority differentiates between the three classes of consumers based on three different circumstances under which they have received such warranties: (1) first purchasers of new vehicles which carry the customary new car warranty; (2) subsequent purchasers of such vehicles who become such prior to the lapse of the original new car warranty; and (3) those subsequent purchasers who obtain such vehicles from a dealer after the lapse of the original warranty but who receive equivalent warranty protection.

Because the plain meaning of the statutory language clearly delineates and distinguishes the three protected classes of consumers without redundancy or ambiguity, these contortions were wholly unnecessary. Contrary to the majority's analysis, I perceive these "consumers" to share but a single attribute: they all have some interest in a "new vehicle," as that term is commonly understood, which carries the customary new car warranty. They are not all "purchasers," as the majority suggests. In fact, the ownership interest enjoyed by a purchaser distinguishes the "consumer" defined in subsection (A) from the two alternative consumer classes de-

fined in subsections (B) and (C). Subsection (B) refers to a non-purchasing party to whom some ownership interest in the new vehicle has nevertheless been transferred during the term of the original new car warranty. Clearly, that subsection describes the circumstances of lenders having a security interest in the vehicle. It is equally clear that subsection (C) has extended the protections of the statute to those without any such ownership interest in the vehicle. That is, the legislature has included among "consumers" not only purchasers and non-purchasing transferees of new vehicles but also those leasing new vehicles.

Reading the definition of "consumer" in this manner achieves a reasonable result from the plain meaning of the statutory language and avoids any of the redundancy or ambiguity perceived by the majority. The Wyoming "Lemon Law," W.S. 40–17–101, is restricted in its application to new cars only, providing in part as follows:

"(b) If a *new motor vehicle* does not conform to all applicable express warranties and the consumer reports the nonconformity to the manufacturer, its agent or its authorized dealer within one (1) year following the original delivery of the motor vehicle to the consumer, the manufacturer, its agent or authorized dealer shall make repairs necessary to conform the vehicle to the express warranties. The necessary repairs shall be made even if the one (1) year period has expired.

"(c) If the manufacturer, its agents or authorized dealers are unable to conform the motor vehicle to any applicable express warranty by repairing or correcting any defect or condition which substantially impairs the use and fair market value of the motor vehicle to the consumer after a reasonable number of attempts, the manufacturer shall:

"(i) Replace the motor vehicle with a new or comparable motor vehicle of the same type and similarly equipped; or

"(ii) Accept return of the motor vehicle * * *." (emphasis added)

A 1983 Buick, having 6700 miles on its odometer when purchased in 1985 by its second owner, is not a new car. I, therefore, respectfully dissent from that portion of the majority opinion holding that appellant is entitled to the protection of Wyoming's "Lemon Law."

I concur in the resulting remand of this case, nevertheless, because recovery may be had by plaintiff under the Magnuson–Moss Warranty Act.